2014 COA 127

**Richard GAGNE, Plaintiff–Appellee and Cross–Appellant,**

v.

**Paula GAGNE, f/k/a Paula Knauss; Academy Park, LLC, a Colorado Limited Liability Company; Magnolia Park, LLC, a Colorado Limited Liability Company; Library Park Apts., LLC, a Colorado Limited Liability Company; and Spring Park Apartments, LLC, a Colorado Limited Liability Company, Defendants–Appellants and Cross–Appellees.**

**Court of Appeals No. 13CA0472**

Colorado Court of Appeals,
Division III.

Announced September 25, 2014

§ 24–51–1105, C.R.S. 2014.

1154

Otis & Peters, LLC, Jennifer Lynn Peters, Timothy R. Odil, Greeley, Colorado, for Plaintiff–Appellee and Cross–Appellant.

Burg Simpson Eldredge Hersh & Jardine, P.C., David P. Hersh, Diane Vaksdal Smith, Kevin M. Bemis, Englewood, Colorado, for Defendants–Appellants and Cross–Appellees.

Opinion by JUDGE GABRIEL

¶ 1 In this dispute between the members of four limited liability companies (the LLCs), defendant, Paula Gagne, appeals the district court's declaratory judgment, and plaintiff, Richard Gagne, cross-appeals that same judgment as well as the district court's rulings (1) granting partial summary judgment to Paula Gagne on his judicial dissolution claim, (2) denying his request to require Paula Gagne to disgorge the attorney fees· that the LLCs paid on her behalf, and (3) denying his requests for attorney fees. For clarity and ease of reference, and without intending any disrespect to the parties, we will refer to the parties by their first names.

¶ 2 Addressing an apparent matter of first impression, we construe section 7–80–810(2), C.R.S.2014, which governs the judicial dissolution of a limited liability company, and conclude that a limited liability company may be dissolved if a party seeking a judicial dissolution shows that the managers and members of the company are unable to pursue the purposes for which the company was formed in a reasonable, sensible, and feasible manner. Applying this standard here, we conclude that genuine issues of material fact preclude the entry of partial summary judgment on Richard's judicial dissolution claim and therefore reverse the partial summary judgment on that claim.

¶ 3 We further conclude that (1) paragraph 4 of each of the LLCs' Membership Agreements (LLC Agreements) is ambiguous and that further findings are required as to the parties' intent; (2) the district court erred in issuing a declaratory judgment on matters for which a declaration was not sought; and (3) although the district court erred in concluding that section 13–17–201, C.R.S.2014, applies only to C.R.C.P. 12(b) motions filed by defendants, and not to such motions when filed by plaintiffs seeking to dismiss counterclaims, Richard has failed to establish a right to such fees on the facts of this case.

¶ 4 In all other respects, we affirm.

I. Background

¶ 5 Paula and Richard are mother and son, and they are the sole members of the four LLCs, each of which owns multi-unit apartment complexes. Paula and Richard's business relationship has been exceedingly difficult, and it has been marked by extreme dysfunction, allegations of physical altercations, mutual distrust, ongoing allegations of wrongdoing by the other, and legal proceedings or threats thereof.

¶ 6 The LLC Agreements provide that Paula is the LLCs' Chief Executive Manager and that she has fifty-one percent of the memberships' voting rights. The Agreements acknowledge, however, that Richard has made in-kind contributions earning him

an equal ownership interest in the LLCs' income and accumulation of assets. The Agreements further state, in their recitals, that the LLCs' success "requires the active interest, support, cooperation, and personal attention of the Members."

¶ 7 As pertinent here, paragraph 4 of each of the LLC Agreements concerns the management of the LLCs' properties, and it details the property management rights and obligations of Paula, Richard, and Home Management Solutions, Inc. (HSI), a company owned and operated by Richard and his wife. That paragraph provides, in part, that HSI shall be responsible for all property management of the LLCs' assets for a period of twenty-four months for $50 per unit per month. Thereafter, the members could, by unanimous agreement, vote to extend the agreement with HSI on identical terms. Alternatively, HSI was given the first right of refusal to continue property management for $25 per unit per month, for successive twelve-month renewable terms, unless Paula determined that HSI had engaged in gross negligence or insurmountable disagreements arose.

¶ 8 In January 2011, the parties held a week-long meeting regarding the LLCs' future. This meeting resulted in mediation before a third-party mediator. At the conclusion of the mediation, the mediator produced a draft memorandum of agreement, but neither party signed it. Thereafter, Richard prepared so-called "minutes" of the parties' week-long meeting (Meeting Minutes). Both parties signed these Minutes and initialed each page. These Minutes state, "As a result of Mediation and further discussions, the following items were resolved." The Minutes then provide, among other things, that HSI shall have the "ongoing first right of refusal" to manage the LLCs' properties for $50 per unit per month.

¶ 9 Approximately one year later, Richard initiated the present action, alleging that he and Paula had been unable to agree on the continued operation and management of the LLCs and had reached an impasse as to an equitable distribution of the LLCs or their assets. As pertinent here, Richard brought claims for (1) judicial dissolution of the LLCs

and (2) a declaratory judgment setting forth his and Paula's respective rights, status, and legal relations and concerning, among other things, the LLCs' ownership interests and management. Richard also sought the appointment of a receiver. Although the court initially granted the motion to appoint a receiver, it later redesignated the receiver as a custodian to operate the LLCs during the present litigation.

¶ 10 Paula responded to Richard's complaint by denying his principal allegations and asserting counterclaims against him for unjust enrichment, conversion, "constructive trust," breach of fiduciary duty, and "specific performance." Richard moved to dismiss these counterclaims for failure to state a claim on which relief could be granted, and the court granted his motion. Richard then sought attorney fees pursuant to section 13–17–201, but the court deferred ruling on that motion.

¶ 11 In the interim, Paula moved for partial summary judgment on Richard's judicial dissolution claim. The court granted this motion in a detailed written order, reasoning, in pertinent part, that (1) the LLC Agreements provided a means of navigating around membership deadlock; and (2) the purpose of the LLCs, namely, the operation of the apartment complexes, could continue on a profitable basis in accord with the LLC Agreements' terms, even in the absence of cooperation between the parties.

¶ 12 While the above-described pretrial motions were being litigated, HSI sent a letter to the custodian purporting to exercise its first right of refusal pursuant to paragraph 4 of the LLC Agreements. Paula responded with a letter to the custodian stating that she had determined that HSI had committed gross negligence and that insurmountable disagreements had arisen between her and HSI. Paula thus asserted that HSI did not have the first right of refusal to continue as the property manager. The parties did not then engage in mediation regarding this dispute.

¶ 13 The case proceeded to trial on the parties' respective declaratory judgment claims. As pertinent here, in pretrial papers

framing the issues for trial, Richard asserted that the Meeting Minutes amended the first right of refusal granted to HSI in the LLC Agreements and granted HSI an ongoing right of first refusal, without limitation, so long as the LLCs owned the subject real properties. Richard further asserted that HSI had timely exercised this first right of refusal but that Paula was seeking to terminate HSI and replace it with another property manager.

¶ 14 Paula, in contrast, argued that under the LLC Agreements, she retained the authority to remove HSI as property manager and properly exercised that right.

¶ 15 Trial commenced, and at the beginning of the trial, Richard's counsel informed the court that he had learned that Paula had entered into an employment contract with another son, Jay Gagne. Richard claimed that this contract, which Paula had concealed from him, represented a breach of, among other things, Paula's fiduciary duties to the LLCs. Richard thus advised the court that he intended to move for reconsideration of the partial summary judgment on his judicial dissolution claim, and he orally requested that the court recast the custodian as a receiver.

¶ 16 The parties proceeded through the evidentiary portion of the trial, and after trial, Richard filed his promised motion to reconsider the partial summary judgment ruling, as well as a written motion to redesignate the custodian as a receiver. These motions were based on Paula's contract with Jay. In addition, Richard alluded to a loan that Paula had made to one of the LLCs in which Paula signed the paperwork as both lender and borrower.

¶ 17 The district court ultimately issued a lengthy and comprehensive order disposing of the above-described motions and the claims remaining before it.

¶ 18 The court first denied Richard's renewed motion for the appointment of a receiver and his motion to reconsider the court's grant of partial summary judgment on his judicial dissolution claim. Although the court concluded that Paula's actions in hiring Jay and in making the loan to one of

the LLCs did not support converting the custodian to a receiver or granting a judicial dissolution, the court noted that these facts raised legitimate concerns that the court could address by less drastic means.

¶ 19 The court then proceeded to address the parties' declaratory judgment claims relating to the issues of property management. The court began its analysis by assuming without deciding that the Meeting Minutes represented an agreement between the parties to amend the LLC Agreements. The court concluded, however, that, at most, this agreement amended only the portion of paragraph 4(C) that established HSI's rate of pay for continued management. It did not constitute an amendment superseding the other provisions of paragraph 4. The court then found that paragraph 4 gave Paula the right to act unilaterally in selecting a property manager but that if she did so, Richard would be absolved of his obligations to contribute his services for property management or to pay a portion of the cost of any subcontracted property management.

¶ 20 The court then proceeded to the issues of the contract with Jay and the LLC loan, which issues the court said it could address in the context of the parties' declaratory judgment claims. The court concluded that Paula's conduct in signing the contract with Jay represented a breach of her contractual duty (in the LLC Agreements) to act in good faith, and the court ordered Paula to indemnify, defend, and hold harmless the LLCs and Richard for any claims, including attorney fees and court costs, arising from or related to the contract with Jay. The court likewise found that Paula's conduct in making the LLC loan was a breach of her contractual duty of good faith, and it declared the loan null and void and ordered that it be considered a capital contribution by Paula to the borrower LLC.

¶ 21 Thereafter, Richard requested that the district court order, among other things, that Paula disgorge and return to the LLCs the attorney fees paid to Paula by the LLCs for her defense against Richard's claims. Richard further requested that the court award him attorney fees based on (1) the court's declaration that Paula must indemnify

him for all claims, including attorney fees, arising from or related to the contract with Jay; and (2) the fee-shifting provision in the LLC Agreements, given the court's declaration that Paula had breached those agreements. The court denied these requests and also denied Richard's prior request for attorney fees pursuant to section 13–17–201, on which the court had deferred ruling. As pertinent here, the court concluded that section 13–17–201 applied only to defendants who obtain C.R.C.P. 12(b) dismissals of another party's complaint, and not to a plaintiff who obtains a C.R.C.P. 12(b) dismissal of a counterclaim.

¶ 22 Paula now appeals, and Richard cross-appeals.

## II. Judicial Dissolution

¶ 23 Richard contends that the district court erred in granting partial summary judgment to Paula on his claim for judicial dissolution. We agree.

### A. Standards of Review and Statutory Construction

¶ 24 We review de novo an order granting a motion for summary judgment. *Colo. Cmty. Bank v. Hoffman*, 2013 COA 146, ¶ 36, 338 P.3d 390. Summary judgment is proper only when the pleadings and supporting documents show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *Colo. Cmty. Bank*, ¶ 36, 338 P.3d at 396. In determining whether summary judgment is proper, a court grants the nonmoving party any favorable inferences reasonably drawn from the facts and resolves all doubts in favor of the nonmoving party. *Colo. Cmty. Bank*, ¶ 36, 338 P.3d at 396. In responding to a properly supported summary judgment motion, however, the nonmoving party "may not rest upon mere allegations or denials in its pleadings, but must provide specific facts demonstrating the existence of a genuine issue for trial." *Sender v. Powell*, 902 P.2d 947, 950 (Colo.App.1995); *accord* C.R.C.P. 56(e).

¶ 25 We likewise review issues of statutory construction de novo. *See Chittenden v. Colo. Bd. of Soc. Work Exam'rs*, 2012 COA 150, ¶ 11, 292 P.3d 1138, 1140. Our primary purpose in statutory construction is to ascertain and give effect to the intent of the General Assembly. *Id.* We look first to the language of the statute, giving words and phrases their plain and ordinary meanings. *Id.* We read words and phrases in context and construe them according to their common usages. *Id.* at 292 P.3d at 1141.

¶ 26 In addition, we must interpret a statute in a way that best effectuates the purpose of the legislative scheme. *Id.* at 292 P.3d at 1141. When a court construes a statute, it should read and consider the statute as a whole and interpret it in a manner giving consistent, harmonious, and sensible effect to all of its parts. *Id.* In doing so, a court should not interpret the statute so as to render any part of it either meaningless or absurd. *Id.*

¶ 27 If the statute is unambiguous, we look no further. *Id.* at 292 P.3d at 1141. We may, however, look to the decisions of other states applying statutes comparable to our own. *LaFond v. Sweeney*, 2012 COA 27, ¶ 33, ––– P.3d ––––, 2012 WL 503655 (*cert. granted in part on other grounds* 2013 WL 4008757 (Aug. 5, 2013)).

### B. Construction of Section 7–80–810(2)

¶ 28 Section 7–80–810(2) of the Colorado Limited Liability Act (the Act) provides:

A limited liability company may be dissolved in a proceeding by or for a member or manager of the limited liability company if it is established that it is not reasonably practicable to carry on the business of the limited liability company in conformity with the operating agreement of said company.

¶ 29 The Act does not define "reasonably practicable," nor has any published Colorado case construing section 7–80–810(2) done so. "When a statute does not define its terms but the words used are terms of common usage, we may refer to dictionary definitions to determine the plain and ordinary meaning of those words." *Bachelor Gulch Operating Co. v. Bd. of Cnty. Comm'rs*, 2013 COA 46, ¶ 25, 316 P.3d 43, 48.

¶ 30 "Reasonably" is commonly defined to mean "in a reasonable manner," *Webster's Third New International Dictionary* 1892 (2002), and "reasonable" means "[f]air, proper, or moderate under the circumstances; sensible," *Black's Law Dictionary* 1456 (10th ed. 2014). "Practicable," in turn, is commonly defined to mean, "reasonably capable of being accomplished; feasible in a particular situation." *Black's Law Dictionary,* at 1361; *see also Webster's Third New International Dictionary,* at 1780 (defining "practicable" as "possible to practice or perform," "capable of being put into practice, done, or accomplished," and "feasible").

¶ 31 Based on these common definitions, we conclude that to show that it is not reasonably practicable to carry on the business of a limited liability company, a party seeking a judicial dissolution must establish that the managers and members of the company are unable to pursue the purposes for which the company was formed in a reasonable, sensible, and feasible manner. *Cf. Taki v. Hami,* No. 219307, 2001 WL 672399, at *3 (Mich.Ct.App. May 4, 2001) (unpublished opinion) (defining "reasonably practicable" in Michigan's Uniform Partnership Act to mean "capable of being done logically and in a reasonable, feasible manner").

¶ 32 This definition is in accord with other state courts' interpretations of the "not reasonably practicable" standard for dissolving a limited liability company.

¶ 33 For example, courts have emphasized that the test is whether it is reasonably practicable to carry on the business of the LLC, not whether it is impossible to do so. *See Fisk Ventures, LLC v. Segal,* No. 3017–CC, 2009 WL 73957, at *3 (Del. Ch. Jan. 13, 2009) (unpublished opinion), *aff'd,* 984 A.2d 124 (Del.2009); *In re 1545 Ocean Ave., LLC,* 72 A.D.3d 121, 893 N.Y.S.2d 590, 598 (N.Y.App.Div.2010).

¶ 34 Moreover, courts have recognized, as do we, that

[g]iven its extreme nature, judicial dissolution is a limited remedy that [courts] grant[ ] sparingly. The court will not dissolve an LLC merely because the LLC has not experienced a smooth glide to profitability or because events have not turned out exactly as the LLC's owners originally envisioned; such events are, of course, common in the risk-laden process of birthing new entities in the hope that they will become mature, profitable ventures. In part because a hair-trigger dissolution standard would ignore this market reality and thwart the expectations of reasonable investors that entities will not be judicially terminated simply because of some market turbulence, dissolution is reserved for situations in which the LLC's management has become so dysfunctional or its business purpose so thwarted that it is no longer practicable to operate the business, such as in the case of a voting deadlock or where the defined purpose of the entity has become impossible to fulfill.

*In re Arrow Inv. Advisors, LLC,* No. 4091–VCS, 2009 WL 1101682, at *2 (Del. Ch. Apr. 23, 2009) (unpublished opinion) (footnotes omitted); *accord 1545 Ocean Ave.,* 893 N.Y.S.2d at 597; *see also 1545 Ocean Ave.,* 893 N.Y.S.2d at 598 (noting that judicial dissolution is a "drastic remedy").

¶ 35 In determining whether it is reasonably practicable to carry on the business of a limited liability company, courts have considered a number of factors that should be weighed in considering a request for judicial dissolution of a limited liability company. These include, but are not limited to, (1) whether the management of the entity is unable or unwilling reasonably to permit or promote the purposes for which the company was formed; (2) whether a member or manager has engaged in misconduct; (3) whether the members have clearly reached an inability to work with one another to pursue the company's goals; (4) whether there is deadlock between the members; (5) whether the operating agreement provides a means of navigating around any such deadlock; (6) whether, due to the company's financial position, there is still a business to operate; and (7) whether continuing the company is financially feasible. *See Lola Cars Int'l Ltd. v. Krohn Racing, LLC,* Nos. 4479–VCN, 4886–VCN, 2010 WL 3314484, at *22 (Del. Ch. Aug. 2, 2010) (unpublished opinion); *In re Cat Island Club, L.L.C.,* 94 So.3d 75, 79–80

(La.Ct.App.2012); *1545 Ocean Ave.,* 893 N.Y.S.2d at 597–98.

¶ 36 No one of these factors is necessarily dispositive. *See Lola Cars Int'l Ltd.,* Nos. 4479–VCN, 4886–VCN, 2010 WL 3314484, at *22. Nor must a court find that all of these factors have been established in order to conclude that it is no longer reasonably practicable for a business to continue operating. *Id.*

¶ 37 To the extent that Richard argues for a more liberal standard for judicial dissolution than the one that we have adopted, we reject his arguments for several reasons.

¶ 38 First, he suggests that because Colorado's General Assembly created its limited liability company statute by combining features of its existing limited partnership and corporation statutes, *see LaFond,* ¶ 31, —— P.3d at ——, Colorado limited liability companies may be dissolved based solely on oppressive conduct (like corporations) or on substantial misconduct (like partnerships), *see Polk v. Hergert Land & Cattle Co.,* 5 P.3d 402, 404 (Colo.App.2000) (discussing judicial dissolution of a corporation); *Mahon v. Harst,* 738 P.2d 1190, 1194 (Colo.App.1987) (discussing judicial dissolution of a partnership). The language of the statutes governing judicial dissolutions of corporations and partnerships, however, is different from the language in the statute at issue here. *Compare* § 7–80–810(2) (governing judicial dissolution of a limited liability company), *with* § 7–114–301(2), C.R.S.2014 (governing judicial dissolution of a corporation), *and* § 7–60–132(1), C.R.S.2014 (governing judicial dissolution of a partnership). We must presume that the legislature adopted different language for a reason, and we must give effect to that intent. *See Robinson v. Colo. State Lottery Div.,* 179 P.3d 998, 1010 (Colo.2008) ("In interpreting statutory language, we presume that the legislature did not use language idly. Rather the use of different terms signals an intent on the part of the General Assembly to afford those terms different meanings.") (citation omitted).

¶ 39 Second, to the extent that Richard asserts that a member's or manager's misconduct alone establishes that it is not reasonably practicable to operate a limited liability company, he cites no authority supporting such a position, and the authority that we have seen is to the contrary. *See, e.g., Houser v. River Loft Assocs. Ltd. P'ship,* No. Civ. A. 98–4312B, 1999 WL 33594570, at *2 (Mass.Super.Ct. Mar. 15, 1999) (unpublished memorandum and order) (concluding that allegations of the general partners' self-dealing failed to show, for purposes of dissolution, that it was not reasonably practicable to carry on the business in conformity with the partnership agreement). Thus, as noted above, such misconduct is only one factor that a court may consider in determining whether a business's continued operation is reasonably practicable. *See In re Cat Island Club,* 94 So.3d at 79 (concluding that it was not reasonably practicable to carry on the business of a limited liability company when certain members believed another member was engaged in self-dealing, and that fact and others showed that the members had "clearly reached an inability to work toward any goals or reasons for continued association with one another").

## C. Application

¶ 40 Applying the above-defined standard for judicial dissolution of a limited liability company to the facts of this case, we conclude that genuine issues of material fact preclude the entry of partial summary judgment on Richard's judicial dissolution claim.

¶ 41 As an initial matter, we, like the district court, observe that there were no allegations and no evidence presented in the partial summary judgment briefing that the LLCs were "financially unfeasible" as business entities. To the extent that Richard contends otherwise on appeal, we will not consider that contention. *See Luttgen v. Fischer,* 107 P.3d 1152, 1155 (Colo.App.2005) ("On review of a summary judgment ruling, we do not consider arguments and evidence that were not presented to the trial court.").

¶ 42 The summary judgment record, however, contains substantial evidence raising a genuine issue of material fact as to whether Paula and Richard can pursue the purposes for which the LLCs were formed in a reasonable, sensible, and feasible manner.

¶ 43 For example, based on the evidence that Richard presented in connection with his motion for reconsideration of the district court's partial summary judgment order, the court found breaches by Paula of her contractual duty of good faith, noting, among other things, that Paula's contract with Jay was the product of Paula's "fraud, deceit, gross negligence, and willful misconduct."

¶ 44 In addition, the summary judgment record is replete with evidence of extreme dysfunction between the parties. This evidence includes allegations of physical altercations; assertions that Paula fears Richard and his wife; and statements by Paula that her relationship with Richard and his family "ha[d] deteriorated to zero" and that "[e]veryone in my life is unanimous that the partnerships need to end for both our sakes."

¶ 45 The evidence presented also raises a genuine issue of material fact as to whether there is a deadlock between Paula and Richard and whether the LLC Agreements provide a suitable means for navigating around any such deadlock, which, although not dispositive, are factors that we may consider in determining whether it is reasonably practicable to carry on the business of the LLCs. In this regard, we cannot say that, as a matter of law, the LLC Agreements provide an effective means for resolving the disagreements between Paula and Richard. For example, although the Agreements provide for mediation in certain circumstances, they do not address the situation in which mediation fails, as occurred here. Nor do the LLC Agreements appear to provide for the scenario in which Richard is willing and able to complete his responsibilities as "hands on" member of the LLC, he communicates appropriately with Paula and cooperates in the process of selecting a new property manager, but the parties nonetheless cannot agree on a new property manager.

¶ 46 We also cannot say that, as a matter of law, Paula's position as Chief Executive Manager of the LLCs, her fifty-one percent voting interest, and her undisputed right to sell the assets of the companies provide a means for navigating around any deadlocks and pursuing the purposes for which the

companies were formed in a reasonable, sensible, and feasible manner. With respect to Paula's position as Chief Executive Manager and her fifty-one percent voting interest, as discussed more fully below, it is not clear to us that the LLC Agreements give her the unilateral right to control all management of the properties, regardless of Richard's views and cooperation. For example, paragraph 4(F) of each of the LLC Agreements appears to require unanimous agreement of the members to hire and fire a new property manager and gives Paula the unilateral right to do so only if (1) Richard is unwilling or unable to contribute "hands on" supervision and assistance and (2) he does not cooperate with the process of retaining the new manager.

¶ 47 And although Paula has the unilateral right to sell the LLCs' assets, this right, when unexercised, does not provide an effective means to navigate around any deadlocks, as demonstrated by the scenario presented here, where Richard wishes to dissolve the LLCs but Paula apparently does not, given her resistance to Richard's motion for judicial dissolution. Unless and until Paula exercises her right to sell the assets, her ongoing disagreements with Richard over operations at least raise a factual dispute as to whether the members are able to pursue the purposes for which the LLCs were formed in a reasonable, sensible, and feasible manner.

¶ 48 For these reasons, and acknowledging that the district court did not have the benefit of the standard that we announce today when it ruled on Paula's motion for partial summary judgment, we conclude that genuine issues of material fact preclude the entry of partial summary judgment on Richard's judicial dissolution claim. We therefore reverse the partial summary judgment as to that claim and remand this case for further proceedings on it.

### III. Declaratory Judgment: Property Management

¶ 49 Paula and Richard both assert that the district court erred in its resolution of the parties' declaratory judgment claims regarding the management of the properties. Richard contends that the court erred in con-

cluding that Paula had a unilateral right to remove HSI. Paula contends that the court correctly so held but erred in concluding that if she unilaterally selected a new property manager, then Richard no longer had any obligation to contribute personally or financially to the management of the properties. We conclude that paragraph 4 of the LLC Agreements is ambiguous and that further findings are necessary regarding the parties' intent.

### A. Standard of Review and Principles of Contract Interpretation

¶ 50 We review questions of contract interpretation de novo. *Meyerstein v. City. of Aspen*, 282 P.3d 456, 468 (Colo.App.2011). Whether a contract is ambiguous also presents a question of law that we review de novo. *Extreme Constr. Co. v. RCG Glenwood, LLC*, 2012 COA 220, ¶ 24, 310 P.3d 246, 252. Accordingly, we may conclude that a contract is ambiguous even if the parties did not so argue. *See, e.g., Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir.2009); *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex.1993).

¶ 51 Well-established principles of contract law guide our review, with our primary goal being to determine and give effect to the intent of the parties. *Meyerstein*, 282 P.3d at 468. We ascertain the parties' intent primarily from the language of the instrument itself. *Id.* In ascertaining whether certain provisions of an agreement are ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed. *Id.* When the written contract is complete and free from ambiguity, we will conclude that it expresses the intentions of the parties and enforce it according to its plain language. *Id.*

¶ 52 Extraneous evidence is only admissible to prove intent when there is an ambiguity in the terms of the contract. *Id.* Terms used in a contract are ambiguous when they are susceptible of more than one reasonable interpretation. *Id.* If a contract is ambiguous, the determination of the parties' intent is a question of fact. *Moland v.*

*Indus. Claim Appeals Office*, 111 P.3d 507, 510 (Colo.App.2004).

¶ 53 We interpret a contract "in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless." *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo.1984). We do not view clauses or phrases in isolation. *U.S. Fid. & Guar. Co. v. Budget Rent–A–Car Sys., Inc.*, 842 P.2d 208, 213 (Colo.1992). In addition, we must interpret and enforce contracts as written, and we cannot rewrite or restructure them. *Janicek v. Obsideo, LLC*, 271 P.3d 1133, 1138 (Colo.App.2011).

### B. Paragraph 4 and the Meeting Minutes

¶ 54 Paragraph 4 of the LLC Agreements provides, in pertinent part:

C. [HSI] shall have the first right of refusal to continue management for total consideration of $25 per unit per month, for successive 12 month renewable terms, unless any gross negligence or other insurmountable disagreements are determined by the Chief Executive Manager of the LLC. If there is a disagreement as to the determination of gross negligence or other insurmountable disagreements, the parties shall submit their dispute to Mediation for swift and cost effective resolution. There is a need for open communication, full disclosure and reporting between [HSI] and all Members.

D. If [HSI] is unwilling or unable to continue property management or if the Chief Executive Manager of the LLC is unwilling to renew the 12 month term with [HSI] for $25 per unit per month, then $25 per unit per month will be the maximum shared budget the Members will have to spend to sub-contract for Property Management assistance to the LLC until the LLC assets are sold. The remaining management responsibilities will fall to the shoulders of Richard Gagne as the LLC Member who is local and "hands on."

E. If the budget of $25 per unit per month is exceeded for Property Management and/or Richard Gagne is unwilling or unable to complete his responsibilities as the "hands on" Member of the LLC, then

it shall be the sole responsibility of Richard Gagne to pay any and all expenses above and beyond the $25 per unit per month maximum shared budget of LLC Members.

F. If there are costs to the LLC due to an unwillingness or inability of Richard Gagne to contribute "hands on" supervision and assistance to the stewardship of all LLC assets. [sic] And if the fees for the completion of the "hands on" and supplemental management responsibilities of Richard Gagne exceed the $25 per unit per month then there must be unanimous agreement amongst Members for the hiring and firing of the sub-contracted Property Management in accordance with the parties' specifications. This amount above $25 per unit per month, will be paid solely by Richard Gagne. If the Chief Executive Manager of the LLC assumes the responsibility for the hiring and firing of the subcontracted Property Management, then it is expressly understood that Richard Gagne must communicate and cooperate with the process. If Richard Gagne does not cooperate with the process, then the Chief Executive Manager of the LLC shall have the sole right to hire and fire subcontracted Property Management at her discretion.

¶ 55 The Meeting Minutes provide, in pertinent part:

[HSI] shall have the ongoing first right of refusal to manage the properties owned by each of the 4 LLCs for $50/unit/month. The payments of $50 per unit owned by the LLCs shall be due by the 1st of each month and is payable by automatic transfer into the [HSI] bank account. If [HSI] is dissolved for any reason, than [sic] any management company where Richard Gagne is a member shall have first right of refusal to continue management, again for $50 per unit. It is recognized that [HSI] may have suffered some damage to their [sic] reputation as a result of the lawsuit and Richard [Gagne and his wife], the owners of [HSI] have contemplated the changing of the name of the company.

## C. Effect of the Meeting Minutes

 ¶ 56 As an initial matter, we must determine the effect of the Meeting Minutes. Richard contends that the portion of the Meeting Minutes quoted above replaced all of paragraph 4 of the LLC Agreements, or, at a minimum, subparagraphs C, D, E, and F of that paragraph 4, and that the district court erred in ruling to the contrary. We are not persuaded.

¶ 57 In determining the effect of the Meeting Minutes, the district court concluded as follows:

Assuming without deciding for the purposes of this Order that the Minutes represent an agreement between the parties to amend the [LLC] Agreements, the Court determines that they do so only in a limited manner. Specifically, based on the plain language of the Minutes, the Court finds that they at most amend only Section 4.C of the [LLC] Agreements so that the rate of pay for HSI for continued management after expiration of the original 24 months is $50 per unit per month, rather than $25 per unit per month. However, the Court finds no basis for [Richard's] position that the Minutes remove or alter the authority of [Paula], as "Chief Executive Manager" of the LLCs to terminate that option.

The Court is not persuaded by [Richard's] reliance on the term "ongoing" in the Minutes, particularly in light of the fact that the Minutes never mention the [LLC] Agreements, much less indicate anywhere that they represent an agreement to amend them. If the parties had intended such a wholesale amendment to central aspects of the [LLC] Agreements, they should have specified that intent clearly rather than rely on a vague and essentially meaningless term.

¶ 58 We agree with the district court's reasoning as to the limited effect of the Meeting Minutes, and on appeal, Richard has pointed us to no evidence or legal authority demonstrating any flaw in the court's analysis in that regard. Accordingly, we proceed to address the court's construction of paragraph 4 of the LLC Agreements.

## D. Construction of Paragraph 4

¶ 59 At the outset, we agree with the district court that paragraph 4's provisions are "difficult, poorly drafted and to some extent contradictory." For example, paragraph 4(D) refers to subcontracting for property management assistance and then refers to the "remaining management responsibilities" that Richard would have. These "remaining management responsibilities," however, are nowhere defined. Paragraph 4(E) then provides for when Richard must pay expenses above a certain amount, but the conditions are defined with an "and/or" that makes it difficult to assess when such conditions are satisfied. And paragraph 4(F) requires unanimous agreement between Paula and Richard for the hiring and firing of a subcontractor but then, seemingly inconsistently, suggests that Paula has the right to assume the responsibility for such hiring and firing and requires Richard to cooperate in this process. The provision then contains an apparently circular requirement that if Richard fails to cooperate when Paula assumes responsibility for hiring and firing a subcontractor, then Paula would have the sole right to do so.

¶ 60 Because each of these provisions lends itself to a myriad of reasonable interpretations, we conclude that paragraph 4 is ambiguous. The question thus becomes what precisely the parties intended by that paragraph. Here, however, the district court excluded evidence regarding the parties' intent, apparently based on the parties' incorrect assumption that paragraph 4 was unambiguous. Moreover, as noted above, discerning what the parties intended in paragraph 4 is a question of fact on which findings are required.

¶ 61 Accordingly, we conclude that a remand is necessary to allow the court to take evidence regarding the parties' intent and to make findings thereon. Such findings should include whether the parties intended (1) to give Paula the unilateral right not to renew HSI's contract; (2) to give Paula the unilateral right to select a new property manager, even if Richard communicates with her and cooperates in the process of selecting a new manager, and, if so, under what circumstances; (3) to absolve Richard of his obligation to contribute to the costs of such subcontracted property management (or to perform property management services beyond the subcontract) if Paula has not properly selected a new property manager; and (4) to absolve Richard of his obligation to contribute to the costs of such subcontracted property management (or to perform property management services beyond the subcontract) if Paula has properly exercised any right that she has to select a new property manager unilaterally.

## IV. Declaratory Judgment: Contract with Jay and LLC Loan

¶ 62 Paula contends that the district court erred in entering a declaratory judgment regarding (and imposing remedies for her conduct as to) the contract with Jay and the LLC loan. She asserts that the court's ruling was erroneous because Richard never sought declaratory relief relating to either the contract or the loan, and, thus, she had no notice of any such claims. We agree.

¶ 63 "Colorado has a liberal notice-pleading requirement. Nevertheless, an adversary must receive notice of the claims that will be raised at trial. The trial court may not enter judgment based on a theory that was neither presented in pleadings nor pursued at trial." *Command Commc'ns, Inc. v. Fritz Cos.*, 36 P.3d 182, 187 (Colo.App.2001) (citation omitted).

¶ 64 Here, Richard introduced evidence of the contract with Jay and the LLC loan solely in connection with his renewed motion for the appointment of a receiver and his motion to reconsider the grant of partial summary judgment on his judicial dissolution claim. Nowhere in his pleadings did he seek declaratory relief with respect to the contract with Jay or the LLC loan. Nor did he ask the court to order that Paula indemnify him for any losses arising from the contract with Jay or to treat the loan as a capital contribution by Paula to the borrower LLC.

¶ 65 Because Richard never asserted any such claims for relief, and because the parties have not argued (and the record does not show) that such claims were tried by implied

consent, we conclude that the court erred in entering a declaratory judgment on these never-pleaded claims. *See id.*; *accord Dinosaur Park Invs., L.L.C. v. Tello*, 192 P.3d 513, 518 (Colo.App.2008) ("Where, as here, a defense or claim is not pleaded or intentionally and actually tried, a court cannot render a judgment thereon."); *see also Dinosaur Park Invs.*, 192 P.3d at 518 (concluding that issues that were not alleged in the pleadings were not tried by implied consent when "the parties did not present evidence pertaining to those issues at trial, except to the extent any such evidence was relevant to the claims that were tried").

¶ 66 In light of our foregoing disposition, we need not address Paula's other contentions regarding the portion of the declaratory judgment concerning the contract with Jay and the LLC loan.

## V. Disgorgement of Fees

¶ 67 Richard contends that the district court erred in denying his motion to disgorge the attorney fees that the LLCs paid on Paula's behalf in this case. We are not persuaded.

¶ 68 As the district court reasoned, Richard's action represented an attempt to "undo" the LLCs and distribute their assets, and Paula, acting as Chief Executive Manager of the LLCs, defended against Richard's efforts to do so. In these circumstances, we perceive no impropriety in Paula's using LLC funds to defend against Richard's claims. Accordingly, we conclude that the LLCs properly paid the attorney fees here, and, thus, the district court correctly denied Richard's request that Paula disgorge such fees. *See* § 7–80–407, C.R.S.2014.

¶ 69 Although Richard contends that disgorgement is required under section 7–80–407 because Paula allegedly violated her duties to the LLCs, we will not consider this argument because Richard made it for the first time on appeal. *See Adams Reload Co. v. Int'l Profit Assocs.*, 143 P.3d 1056, 1060 (Colo.App.2005) ("Arguments not presented to or ruled on by the trial court cannot be raised for the first time on appeal.").

## VI. Attorney Fees

¶ 70 Richard contends that the district court erred in denying his requests for attorney fees pursuant to (1) section 13–17–201; (2) the district court's order requiring Paula to indemnify him for any damages, including attorney fees, arising from or related to the contract with Jay; and (3) the fee-shifting provisions of the LLC Agreements. Addressing an apparent issue of first impression, we conclude that section 13–17–201 applies to the dismissal of counterclaims against a plaintiff pursuant to the plaintiff's C.R.C.P. 12(b) motion. We further conclude, however, that Richard has failed to establish that he is entitled to recover fees pursuant to section 13–17–201 on the facts of this case.

¶ 71 Accordingly, we affirm the district court's order denying Richard's motion for attorney fees pursuant to section 13–17–201. We also affirm the district court's denial of fees on the other grounds that Richard asserts.

### A. Section 13–17–201

¶ 72 Whether section 13–17–201 mandates an award of attorney fees is a question of statutory interpretation that we review de novo. *Castro v. Lintz*, 2014 COA 91, ¶ 11, 338 P.3d 1063, 2014 WL 3511791.

¶ 73 Section 13–17–201 provides, in pertinent part:

> In all actions brought as a result of a death or an injury to person or property occasioned by the tort of any other person, where any such action is dismissed on motion of the defendant prior to trial under rule 12(b) of the Colorado rules of civil procedure, such defendant shall have judgment for his reasonable attorney fees in defending the action.

¶ 74 Under this statute, an award of attorney fees is mandatory when a trial court dismisses a tort action under C.R.C.P. 12(b). *Castro*, ¶ 12, 338 P.3d at 1067.

¶ 75 Here, the district court concluded that section 13–17–201 does not apply when a plaintiff obtains a C.R.C.P. 12(b) dismissal of a defendant's counterclaims because the statute says that it applies when an

action is dismissed on motion of "the defendant," and the defendant is not the plaintiff. We disagree with the court's interpretation of the statute.

¶ 76 Although section 13–17–201 does not define "defendant," that term is commonly defined to refer to "[a] person sued in a civil proceeding." *Black's Law Dictionary*, at 508. By this definition, a defendant includes a person sued via a counterclaim, because a counterclaim defendant is a person sued in a civil proceeding.

¶ 77 Indeed, at least one division of this court has used the term "counterclaim defendant" to refer to a plaintiff defending against a counterclaim. *See Lawry v. Palm*, 192 P.3d 550, 565 (Colo.App.2008). Moreover, although the civil rules do not appear to use the term "counterclaim defendant," they do recognize that a party can be both a plaintiff and a defendant simultaneously, as, for example, when a defendant asserts a cause of action as a third-party plaintiff. *See* C.R.C.P. 14; *see also* C.R.C.P. 110(d) ("Where a cross claim, counterclaim or third-party claim is filed, the claimant thereunder shall have the same rights and remedies as if a plaintiff."). And we note that in the caption of her pleadings, Paula herself referred to Richard as one of the "Counterclaim-Defendants" in this case.

▉ ¶ 78 In our view, reading the term "defendant" in section 13–17–201 to apply to a plaintiff defending against counterclaims effectuates the statute's purpose, which is "to discourage and deter the institution or maintenance of unnecessary litigation concerning tort claims." *Emp'rs Ins. of Wausau v. RREEF USA Fund–II (Colo.), Inc.*, 805 P.2d 1186, 1188 (Colo.App.1991). A contrary reading of the statute, in contrast, would lead to absurd results: "The happenstance of who gets to the courthouse first should not dictate whether attorney's fees and costs should be recoverable by the prevailing party." *Fontana Police Dep't v. Villegas–Banuelos*, 74 Cal. App.4th 1249, 88 Cal.Rptr.2d 641, 643 (Cal. Ct.App.1999); *see also PurCo Fleet Servs., Inc. v. Koenig*, 240 P.3d 435, 447 (Colo.App. 2010) ("[W]e see no reason to create a separate rule for the award of attorney fees and costs based on the fortuity of whether [a

Colorado Fair Debt Collection Practices Act] claim was raised as an initial claim or a counterclaim. Both claims and counterclaims, if proved, entitle the party raising them to affirmative relief."), *aff'd*, 2012 CO 56, 285 P.3d 979.

¶ 79 Accordingly, we conclude that a "defendant" under section 13–17–201 includes a counterclaim defendant.

▉ ¶ 80 The question thus becomes whether Richard is entitled to recover fees under the statute here, where Paula's counterclaims included both tort and non-tort claims. We conclude that he is not, because he has not established that Paula's tort claims were predominant or that they sought remedies beyond those that Paula sought in connection with her non-tort claims.

▉ ¶ 81 When a party has pleaded both tort and non-tort claims, a court must determine, as a matter of law, whether the essence of that party's action was one in tort, in order to ascertain if section 13–17–201 applies. *See Castro*, ¶ 16, 338 P.3d 1063, 1067. In doing so, the court should focus on the manner in which the claims were pleaded. *Id.* In addition, the court should rely on the pleading party's characterization of its claims and should not consider what the party should or might have pleaded. *See id.*

¶ 82 In *Dubray v. Intertribal Bison Coop.*, 192 P.3d 604, 607 (Colo.App.2008), the division considered the application of section 13–17–201 in a case involving the dismissal of both tort and non-tort claims. The division determined that the essence of the action was one in tort because (1) most of the claims were tort claims and (2) the plaintiff "obviously chose to include these claims to obtain relief beyond what was available solely under a breach of contract theory." *Id.*

¶ 83 Subsequent divisions of this court have analyzed the above-referenced factors in determining whether a dismissal of mixed tort and non-tort claims against a party entitles the other party to attorney fees under section 13–17–201. *See, e.g., Castro*, ¶¶ 29–33, 338 P.3d at 1069–70 (concluding that a dismissal did not entitle a party to attorney fees when the essence of the plaintiff's action

was not one sounding in tort and the purpose of his claims was to collect on a workers' compensation award and a judgment that he had already obtained, and not to obtain additional tort remedies); *Crow v. Penrose–St. Francis Healthcare Sys.*, 262 P.3d 991, 997 (Colo.App.2011) (concluding that a dismissal entitled a party to attorney fees when there were an equal number of tort and non-tort claims, but the tort claims sought relief beyond what was available solely under a breach of contract theory); *US Fax Law Ctr., Inc. v. Henry Schein, Inc.*, 205 P.3d 512, 517–18 (Colo.App.2009) (opining that even if the case included a claim not considered a "state tort claim," the case was primarily, if not entirely, a tort action).

¶ 84 A federal district court recently analyzed the foregoing Colorado authority and derived the following test for analyzing the above-referenced factors:

> [T]he most logical sequence to undertake this hybrid analysis is to first apply the "predominance" test, assessing whether the "essence of the action" is tortious in nature (whether quantitatively by simple number of claims or based on a more qualitative view of the relative importance of the claims) or not. The Court would then turn to the question of whether tort claims were asserted to unlock additional remedies only where the predominance test failed to yield a clear answer, such as when the tort- and non-tort claims are equal in number or significance....

*Shell v. Henderson*, No. 09–CV–00309–MSK–KMT, 2014 WL 3716165, at *3 (D.Colo. July 28, 2014). We agree with this synthesis of Colorado law and apply the federal court's test here.

¶ 85 In this case, Paula purported to bring nine counterclaims. Four of those counterclaims, however, were against HSI, not Richard, and thus we do not include them in our analysis of whether Richard is entitled to his attorney fees under section 13–17–201. *See Stauffer v. Stegemann*, 165 P.3d 713, 718 (Colo.App.2006) (noting that section 13–17–201 necessarily applies to each defendant who has an action against it dismissed pursuant to C.R.C.P. 12(b)).

¶ 86 The counterclaims against Richard were for unjust enrichment, conversion, "constructive trust," breach of fiduciary duty, and "specific performance." However, "a constructive trust, being a remedy to prevent unjust enrichment, is not to be pled as a separate cause of action." *Sterenbuch v. Goss*, 266 P.3d 428, 437 (Colo.App.2011) (citation omitted). Likewise, "[s]pecific performance is an equitable remedy for breach of contract." *Wheat Ridge Urban Renewal Auth. v. Cornerstone Grp. XXII, L.L.C.*, 176 P.3d 737, 740 (Colo.2007). Because that remedy does not appear to have been tied to any particular counterclaim, however, we construe it as an attempt to assert a counterclaim in the nature of a breach of contract claim.

¶ 87 Thus, in the present case, the "predominance" factor favors neither Richard nor Paula because Paula effectively brought two tort claims (i.e., conversion and breach of fiduciary duty) and two contract claims (i.e., unjust enrichment and the purported specific performance "claim"). *See Robinson*, 179 P.3d at 1010 (treating an unjust enrichment claim as a contract claim for purposes of section 13–17–201); *Castro*, ¶ 28, 338 P.3d at 1069 ("[I]t is uncontested that breach of fiduciary duty is a tort."); *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1199 (Colo.App. 2009) ("Conversion is an intentional tort....").

¶ 88 The question thus becomes whether Paula's tort claims sought remedies beyond those that she sought in connection with her contract counterclaims. Here, Richard has not shown, nor do we see, how any of Paula's tort counterclaims sought relief beyond the relief sought in her contract counterclaims. To the contrary, Paula appears to have sought precisely the same relief.

¶ 89 Accordingly, we affirm the district court's denial of Richard's request for attorney fees pursuant to section 13–17–201.

### B. Fees Based on the Indemnity Ruling and Fee–Shifting Provisions

¶ 90 Richard contends that he is also entitled to recover his attorney fees pursuant to (1) the district court's order requiring Paula

to indemnify him for any damages, including attorney fees, arising from the contract with Jay and (2) the LLC Agreements' fee-shifting provisions.

¶ 91 Because we have reversed the declaratory judgment establishing the indemnity, we reject Richard's claim for fees based on the indemnity.

¶ 92 Similarly, Richard's claim under the fee-shifting provision was based on the district court's findings that Paula had breached her contractual duties of good faith by entering into the contract with Jay and making the LLC loan. Because we have reversed that finding of breach, we reject Richard's request for attorney fees based on the LLC Agreements' fee-shifting provisions.

### C. Appellate Fees

¶ 93 Richard seeks an award of his appellate fees on the same bases asserted in connection with his request for the fees that he incurred in the district court. For the reasons set forth above in connection with our rejection of Richard's requests to recover the attorney fees that he incurred in the district court, we reject his request for appellate fees.

### VII. Conclusion and Remand Order

¶ 94 For these reasons, the order granting partial summary judgment to Paula on Richard's judicial dissolution claim and the portion of the judgment granting declaratory relief concerning Paula's contract with Jay and Paula's loan to one of the LLCs are reversed; the portion of the judgment granting declaratory relief concerning property management is vacated; and the case is remanded with instructions that the district court (1) conduct further proceedings on the judicial dissolution claim; and (2) take additional evidence and make findings concerning the parties' intent with respect to the LLC Agreements, as more fully discussed in Part III(D), above. In all other respects, the judgment is affirmed.

JUDGE WEBB and JUDGE MILLER concur.