25CA0038 Marriage of Colburn 12-11-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0038
Ouray County District Court No. 18DR15
Honorable D. Cory Jackson, Judge

---

In re the Marriage of

Yolande Miracle Colburn,

Appellant,

and

Larry Rodney Colburn,

Appellee.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE GROVE
J. Jones and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 11, 2025

---

Hogan Omidi PC, Hollie A. Hinton, Denver, Colorado, for Appellant

Heritage Family Law, LLC, Jarod C. Harsha, Broomfield, Colorado, for Appellee

¶ 1    Yolande Miracle Colburn (wife), formerly married to Larry Rodney Colburn (husband), appeals the district court's judgment denying her post-decree motion for a declaratory judgment. We reverse and remand for further proceedings consistent with this opinion.

## I.    Background

¶ 2    Husband and wife had been married for thirty-one years when wife petitioned for legal separation. The parties filed a separation agreement resolving all matters pertaining to their legal separation in 2019. The district court then incorporated the separation agreement into the decree of legal separation, finding that it was "not unconscionable as to support, maintenance (spousal support) and division of property." The decree of legal separation was later converted into a decree of dissolution of marriage.

¶ 3    According to the agreement, husband is required to make monthly maintenance payments to wife in addition to a yearly maintenance payment through 2026. In pertinent part, the paragraph of the agreement describing the schedule for husband's monthly maintenance payments provides as follows: "Husband shall pay maintenance to [w]ife of $8,350.00 per month payable on

or before the third day of each month beginning on the first month after the entry of the Decree of Legal Separation and continuing through February 28, 2026."

¶ 4    The next paragraph of the agreement describes the schedule for husband's yearly payments:

> In addition [to transferring to wife some retirement funds], for year [sic] beginning January 31, 2020, and continuing on January 31st of each year through year 2026, [h]usband shall pay a lump sum maintenance of $35,000.00, subject to an annual adjustment equivalent to the [Consumer Price Index], from [h]usband's annual bonus or other funds in the event [h]usband does not receive an annual bonus.  If [h]usband also receives Goldman Sachs stock as part of his annual bonus, beginning in 2020 and continuing until year 2025, he shall also transfer to [w]ife shares of Goldman Sachs stock with an equivalent value of $13,600.00, by January 31st of each year.  If [h]usband does not receive stock as part of his annual bonus, [h]usband agrees to add $13,600 cash to the lump sum annual maintenance payment through 2026.

¶ 5    In summary, wife is to receive $8,350 per month in maintenance "on or before" the third day of each month.  In addition, she is to receive a yearly maintenance payment — the timing of which we discuss below — and also, "by January 31st of

2

each year," a transfer of Goldman Sachs stock if husband's bonus included a stock award.

¶ 6    Importantly, the agreement also provides that husband's maintenance obligation will be automatically extended from its original expiration date of February 28, 2026, through the end of 2028 if husband "defaults on either his monthly or yearly maintenance payments at any point during the maintenance term."[1]

¶ 7    It is undisputed that husband's monthly maintenance payments were made timely and that, up until 2023, he made his yearly maintenance payments in January of each year. But in 2023 and 2024, because he changed jobs and his new employer disbursed annual bonuses somewhat later, husband made the corresponding yearly maintenance payments in March. Wife's motion for a declaratory judgment asked the court to determine that the 2023 and 2024 annual payments were untimely and, accordingly, rule that husband's maintenance term is extended

_____

[1] The agreement allows for one late payment to be excused each year, so long as that payment is not more than five days late. The payments in question, however, were both made more than five days after January 31 in both 2023 and 2024, so that grace period has no bearing on our analysis.

through the end of 2028.  The court found that the "annual bonus-related maintenance obligation is ambiguous because it does not provide a due date for an annual maintenance payment from bonuses received after January each year."  The court went on to deny wife's motion in its entirety, ruling that, regardless of the correct interpretation of the agreement, it would "work a significant inequity" on husband to extend husband's term of maintenance based on the "relatively small default" caused by "[a] three-month delay in the payment of $35,000.00."

¶ 8     Wife appeals the district court's ruling.

## II.     Relevant Law and Standards of Review

¶ 9     To promote the amicable settlement of disputes, parties to a marriage, in contemplation of their separation or the dissolution of their marriage, may enter into a written separation agreement providing for, as relevant here, maintenance.  § 14-10-112(1), C.R.S. 2025.  A separation agreement is enforceable unless the court, after considering the economic circumstances of the parties and other circumstances, finds it unconscionable.  § 14-10-112(2); *In re Marriage of Salby*, 126 P.3d 291, 295 (Colo. App. 2005).  A

separation agreement is a contract between parties to a marriage. *In re Marriage of Manzo*, 659 P.2d 669, 671 (Colo. 1983).

¶ 10    We apply principles of contract interpretation to determine the meaning of a decree of dissolution that incorporates the parties' separation agreement. *In re Marriage of Thomason*, 802 P.2d 1189, 1190 (Colo. App. 1990).[2] The primary goal when interpreting an agreement is to determine and give effect to the parties' intent based primarily on the language of the agreement. *Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 376 (Colo. 2000); *In re Marriage of Crowder*, 77 P.3d 858, 860-61 (Colo. App. 2003). We construe the agreement's terms in accordance with their plain and generally accepted meanings. *Ad Two*, 9 P.3d at 376. We evaluate an agreement by reviewing it as a whole and avoid interpreting specific phrases or terms in isolation. *See Rogers v. Westerman Farm Co.*, 29 P.3d 887, 898 (Colo. 2001).

---

[2] After the parties' agreed terms are incorporated into the dissolution decree, they are no longer enforceable as contract terms. *See In re Marriage of Chalat*, 112 P.3d 47, 52 (Colo. 2005) (holding that the district court erred by enforcing parties' agreement regarding payment of their children's post-secondary education costs as a contract term after its incorporation into their dissolution decree). They are, however, enforceable "by all remedies available for the enforcement of a judgment." § 14-10-112(5), C.R.S. 2025.

¶ 11     We review de novo whether a contract is ambiguous. *Gagne v. Gagne*, 2014 COA 127, ¶ 50. The language of a separation agreement may be ambiguous if it is susceptible of more than one reasonable interpretation. *Crowder*, 77 P.3d at 861. Absent an ambiguity, a court may "not look beyond the four corners of the agreement to determine" the parties' intent. *Ad Two*, 9 P.3d at 376-77. "If, however, the court finds the contract's terms to be ambiguous, . . . extrinsic evidence can serve as a useful starting point in determining the actual intentions of the parties." *D.C. Concrete Mgmt., Inc. v. Mid-Century Ins. Co.*, 39 P.3d 1205, 1208 (Colo. App. 2001).

¶ 12     We review for an abuse of discretion a court's ruling on a request for entry of a declaratory judgment. *Nash v. Mikesell*, 2024 COA 68, ¶ 15. We review de novo a court's interpretation of an agreement. *See Crowder*, 77 P.3d at 860 (a court's interpretation of a dissolution decree incorporating a separation agreement is reviewed de novo). A court necessarily abuses its discretion when it misapplies the law. *Rinker v. Colina-Lee*, 2019 COA 45, ¶ 29.

### III. The Separation Agreement Is Ambiguous

¶ 13    Wife contends that the district court erred by determining that the separation agreement is ambiguous concerning the date of her yearly maintenance payment. She claims that the separation agreement's language — "for year beginning January 31, 2020, and continuing on January 31st of each year through year 2026 . . . from [h]usband's annual bonus or other funds in the event [he] does not receive an annual bonus" — establishes an annual deadline of January 31 for that payment. She argues that, if husband has not received his bonus by that date, the agreement requires him to pay the amount due from "other funds."

¶ 14    In contrast, husband argues that the language ties the yearly maintenance payment to husband's annual bonus and that, "when the bonus is paid after January 31 . . . the deadline became unclear." Thus, while husband appears to concede that he must make the yearly payment at some point after receiving his annual bonus, he maintains that the date for the payment is flexible if his employer does not pay him the bonus before January 31.

¶ 15    Both sides make good points. On wife's side is the fact that the agreement says, "continuing on January 31st of each year

7

through year 2026, [h]usband shall pay a lump sum maintenance of $35,000.00." This language could be reasonably construed as setting an annual January 31 deadline for husband's yearly maintenance payments. In addition, as wife points out, husband's obligation to make the yearly maintenance payment does not depend on whether he receives a bonus or a stock allocation; to the contrary, if he "does not receive an annual bonus," then he must make the payment from "other funds," and if he "does not receive stock as part of his annual bonus," he must add $13,600 cash to the lump sum annual maintenance payments.

¶ 16     Husband's position, on the other hand, is bolstered by a review of the agreement as whole. As we have already noted, the provision requiring monthly maintenance payments is perfectly clear, requiring husband to make payments "on or before the third day of each month." The deadline for stock transfers is also certain, requiring husband to make the transfer "by January 31st of each year." But the language in the lump sum payment provision differs from both of these phrases, suggesting a reasonable conclusion that the parties may have intended it to mean something different. *See Weitz Co. v. Mid-Century Ins. Co.*, 181 P.3d 309, 313 (Colo. App.

8

2007) (noting that "the use of different terms in [a contract] signals that those terms should be afforded different meanings"); *cf. Ctr. for Wound Healing & Hyperbaric Med. v. Kit Carson Cnty. Health Serv. Dist.*, 2024 COA 24, ¶ 28 (absent a manifest indication to the contrary, the rule of consistent usage requires that the use of the same words or phrases in different parts of a statute should be given the same meaning). Applying that rule, one alternative interpretation of the "lump sum" language would be that husband's deadline for the yearly payment depends on the date that he receives his annual bonus (assuming he receives a bonus at all).

¶ 17     After reviewing the agreement as a whole, we conclude that both interpretations are plausible. While it is certainly possible that the parties intended to set a firm January 31 deadline for husband's yearly payments, the fact that the agreement sets forth three different types of maintenance payments and then describes the due dates for those payments in three different ways casts some doubt on that interpretation. The parties clearly knew how to set a date certain for payments, as evidenced by the fact that monthly payments are due "on or before the third day of each month," and husband's annual stock transfer must be completed "by January

9

31st." Their decision to employ different — and less certain — language for the yearly payment undermines wife's argument that husband's deadline for the yearly payment is January 31. Accordingly, we agree with the district court's conclusion that "[t]he annual bonus-related maintenance obligation is ambiguous because it does not provide a due date for an annual maintenance payment from bonuses received after January of each year."

## IV.   A Hearing is Required to Resolve the Ambiguity

¶ 18     After determining that the separation agreement was ambiguous, the district court denied wife's motion for a declaratory ruling on two grounds: (1) husband could not be in default for the 2023 and 2024 yearly payments "[b]ecause it is unclear what the annual maintenance payment due date is in the event that annual bonuses are not paid until after [the] express deadline"; and (2) "the proposed declaration would work a significant inequity" because, even assuming husband missed any deadlines at all, "[a] three-month delay is a relatively small default." Because these conclusions are the result of legal errors by the district court, we must reverse.

¶ 19    The meaning of an ambiguous contract term cannot ordinarily be resolved as a matter of law.  *See E. Ridge of Fort Collins, LLC v. Larimer & Weld Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005) ("When an ambiguity has been determined to exist, the meaning of its terms is generally an issue of fact to be determined in the same manner as other factual issues.").  Accordingly, once a court determines that the terms of an agreement are ambiguous, unless the facts relative to the parties' intent are undisputed, the court must hold a hearing at which parties may present extrinsic evidence regarding the parties' intent *at the time they entered into the agreement.  Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 915-16 (Colo. 1996) (when a contract contains ambiguities, motion to dismiss must be denied and parties should have a hearing to introduce extrinsic evidence); *see also D.C. Concrete Mgmt.*, 39 P.3d at 1208 (extrinsic evidence is a starting point in determining the parties' intent).

¶ 20    Here, the district court concluded that the ambiguity it identified meant that the husband has no identifiable "express deadline" for his yearly maintenance payments.  But it is precisely because no "express deadline" can be discerned from the separation agreement itself that extrinsic evidence is needed to resolve that

11

issue. In the absence of clear contractual language, the question whether the parties contemplated a strict deadline for the yearly payment, an annual recurring window, or something in between can only be resolved by making factual findings regarding their intent.

¶ 21   For many of the same reasons, we also disapprove of the district court's finding that strict enforcement of an annual January 31 deadline would be inappropriate because it would "work a significant inequity on father." As wife points out, when approving the decree of legal separation several years before husband's alleged default, the court found that the separation agreement was "not unconscionable as to support, maintenance (spousal support) and division of property." Nothing in the record before us suggests that the parties' circumstances have substantially changed and, just as importantly, husband never filed a motion to modify maintenance as contemplated by section 14-10-122 or section 14-10-114, C.R.S. 2025. *See In re Marriage of Tooker*, 2019 COA 83, ¶ 35 ("A district court may modify maintenance on a showing of changed circumstances so substantial and continuing as to make the existing maintenance terms unfair."); *Cedar Lane Invs. v. Am.*

*Roofing Supply of Colo. Springs, Inc.*, 919 P.2d 879, 884 (Colo. App. 1996) ("Equity by its very nature is applied on a case-by-case basis.").

¶ 22  Accordingly, the district court erred by resolving the ambiguity in the separation agreement without holding a hearing at which the parties could present evidence regarding their intent.

## V.  Husband's Request for Attorney Fees

¶ 23  Husband requests attorney fees under section 13-17-102(2) and (4), C.R.S. 2025; C.A.R. 38(b); C.A.R. 39(a)(2); and C.A.R. 39.1. Having determined that the judgment must be reversed, we deny his request.

## VI.  Disposition

¶ 24  The judgment is reversed, and the case is remanded to the district court for further proceedings consistent with this opinion.

JUDGE J. JONES and JUDGE SCHUTZ concur.

13