**CITY OF COLORADO SPRINGS, a
Colorado municipal corporation,
Plaintiff–Appellee,**

v.

**MOUNTAIN VIEW ELECTRIC ASSOCI-
ATION, INC., a Colorado cooperative
corporation, Defendant–Appellant.**

No. 94CA0914.

Colorado Court of Appeals,
Div. I.

Dec. 21, 1995.

As Modified on Denial of Rehearing
April 25, 1996.

Certiorari Denied Oct. 21, 1996.

Anderson, Gianunzio, Dude, Pifher & Lebel, P.C., Wm. Kelly Dude, Colorado Springs, for Plaintiff–Appellee.

Jack P. Wolfe, Longmont, for Defendant–Appellant.

John J. Conway, Denver, for Amicus Curiae Colorado Rural Electric Association.

Gorsuch Kirgis, L.L.C., Joseph B. Wilson, Denver, for Amicus Curiae Colorado Association of Municipal Utilities.

Randolph W. Starr, Loveland, for Amicus Curiae Poudre Valley Rural Electric Association, Inc.

Opinion by Judge METZGER.

In this declaratory judgment action, defendant, Mountain View Electric Association, Inc., (Mountain View) appeals the summary judgment entered in favor of plaintiff, City of Colorado Springs (the City). We reverse and remand for further proceedings.

Mountain View is a cooperative electric association, transmitting and distributing electricity in El Paso and other Colorado counties. The City is a home rule municipality in El Paso County that has exercised its authority to transmit and distribute electricity within its boundaries.

In March of 1981, the parties entered into a contract in which they agreed that:

In any area now within the City in which [Mountain View] is supplying electric service and in any area within which [Mountain View] is supplying electric service to customers that may hereinafter be annexed to the City, [Mountain View], on request of the City, will sell and transfer to the City its distribution facilities ... and easements therefor, located within such annexed area in accordance with the terms and conditions herein contaned [sic]. Upon such transfer, [Mountain View] shall thereupon cease service to its then existing

customers being served by such distribution facilities.

The agreement also required that:

At such time in the future, during the term hereof, should the City give [Mountain View] notice of planned transfers ... [Mountain View] shall promptly file an Application with the Colorado Public Utilities Commission, requesting that the area annexed to the City within which said planned transfers are located, be eliminated from [Mountain View's] certificated service area.

One of the stated purposes of this agreement was "to eliminate possible duplication of facilities in order to obtain economic efficiency and to minimize capital investment to serve."

The contract specifically referred to the transfer of facilities and corresponding territory, but did not make explicit reference to the transfer of territories on which Mountain View had no facilities.

In August 1983, Mountain View exercised its statutory right under § 40–9.5–103, C.R.S. (1993 Repl.Vol. 17) and voted to exempt itself from the provisions of §§ 40–1–101 to 40–7–117, C.R.S. (1993 Repl.Vol. 17). This effectively removed it from much of the regulatory purview of the Colorado Public Utilities Commission (PUC).

Between 1981 and 1986, the City had annexed several parcels of land within Mountain View's service area. During that time, upon request by the City, Mountain View submitted three applications to the PUC for the deletion of these areas from its certificate. In each case, the PUC permitted the deletions, specifically finding that they were not contrary to the public convenience and necessity. The City then compensated Mountain View based on the formula contained in the 1981 contract.

In 1986, the General Assembly enacted §§ 40–9.5–201 to 40–9.5–207, C.R.S (1993 Repl.Vol. 17). This legislation established a procedure to be followed in situations in which a municipality has taken the service rights or facilities of a cooperative electric association. Section 40–9.5–204 establishes a formula for the computation of just compensation for the taking of such facilities or

service areas. This statutory formula would provide Mountain View with greater compensation than the formula adopted in the City's contract with Mountain View.

In 1992, the City again sought to have territories deleted from Mountain View's certificated area. Mountain View protested, arguing that it had no facilities on these territories and that the contract provided only for the transfer of territory that included facilities. Thus, Mountain View formally refused to petition the PUC for permission to delete them.

The City contended that, because the contract permitted the transfer of territories without facilities, Mountain View had breached its promise. Thus, the City filed its own petition with the PUC, seeking to have the affected areas deleted from Mountain View's certificate.

Later, before the PUC had taken any action, the City filed a motion to stay further PUC proceedings and then filed this action. The City sought a declaration of its rights under the contract as well as injunctive relief to compel Mountain View to, among other things, file an application with the PUC for the deletion. Mountain View filed an answer and counterclaim, seeking additional compensation for its service rights within the annexed territory.

After the filing of cross-motions for summary judgment, the trial court granted the City's motion. Additionally, the court ordered Mountain View to file an application with the PUC for the deletion of the affected territories from its certificate.

The court determined that it had jurisdiction to hear the declaratory judgment action pursuant to Colo. Const. art. VI, § 9, which vests district courts with general jurisdiction in civil cases, and C.R.C.P. 57, which permits district courts to issue declaratory judgments. The court further determined that the dispute was essentially one of contract interpretation.

Additionally, the court determined that the oversight of the PUC was not required for three reasons. First, Mountain View had elected to exempt itself from §§ 40–1–101 to 40–7–117, pursuant to § 40–9.5–103. Second,

the PUC had no authority to regulate the City, a home rule city, in the providing of exclusive utility service to customers within its boundaries. Third, Mountain View's certificate of public convenience and necessity could not prevent the City from exclusively serving the parcels it annexed from Mountain View's service area. Thus, the court determined that there were no administrative remedies that the City was required to seek before filing its declaratory judgment action.

The trial court further determined that the contract did not violate state antitrust laws and that the United States was not an indispensable party to this litigation.

### I.

Mountain View first contends that the trial court erred in determining that it had jurisdiction. It argues that the PUC has discretion in determining whether to authorize the deletion of territory from its certificate of public convenience and necessity and that the trial court's ruling to the contrary was error. We disagree.

### A.

■ As a home rule city, the City has the constitutional right to be the sole supplier of electricity within its own boundaries.

Colo. Const. art. XXV provides that:

In addition to the powers now vested in the General Assembly of the State of Colorado, all power to regulate the facilities, service and rates and charges therefor, including facilities and service and rates and charges therefor within home rule cities and home rule towns, of every corporation, individual, or association of individuals, wheresoever situate or operating within the State of Colorado, whether within or without a home rule city or home rule town, as a public utility, as presently or as may hereafter be defined as a public utility by the laws of the State of Colorado, is hereby vested in such agency of the State of Colorado as the General Assembly shall by law designate. Until such time as the General Assembly may otherwise designate, said authority shall be vested in the Public Utilities Commission of the State of Colorado; provided however, nothing herein shall affect the power of municipalities to exercise reasonable police and licensing powers, nor their power to grant franchises; and provided, further, that nothing herein shall be construed to apply to municipally owned utilities.

This article demonstrates "no intention to give the General Assembly authority to regulate a municipally owned utility within the corporate limits of the municipality." *City & County of Denver v. Public Utilities Commission*, 181 Colo. 38, 46, 507 P.2d 871, 875 (1973). The rationale for this rule is. that, inasmuch as persons dissatisfied with the utility's service may use the municipal elections to express their discontent, there is no one who requires protection by the PUC when the utility is owned by a municipality. *K.C. Electric Ass'n Inc. v. Public Utilities Commission*, 191 Colo. 96, 550 P.2d 871 (1976).

Likewise, Colo. Const. art. V, § 35, provides that:

The general assembly shall not delegate to any special commission ... any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever.

This article deprives the General Assembly of the power to delegate authority to the PUC that would interfere with a municipality's ability to make municipal improvements. *City of Thornton v. Public Utilities Commission*, 157 Colo. 188, 402 P.2d 194 (1965); *see also Poudre Valley Rural Electric Ass'n v. Loveland*, 807 P.2d 547 (Colo.1991)(neither PUC approval nor compensation is required when municipality seeks to compete with an established public utility within municipal boundaries).

Further, as stated in § 40–5–104(1), C.R.S. (1993 Repl.Vol. 17):

Any municipality which has acquired or constructed any public utility plant, property, or facility has the power to contract with a public utility for the operation of

any part or the whole thereof, subject to the provisions of articles 1 to 7 of this title and to exercise, in respect to such public utility, the powers of regulation and supervision conferred upon it by the commission.

Thus, the City is immune from PUC regulation of its ownership or operation of an electric utility.

## B.

■ Mountain View, however, contends that § 40–5–105, C.R.S (1993 Repl.Vol. 17) requires that the PUC determine whether the deletion of portions of Mountain View's service area is in the public interest. We conclude that the cited statute is inapplicable here.

Cases addressing situations involving public utilities and concerns of municipalities have implicitly recognized that the matters involved are of mixed state and local concern. *U.S. West Communications, Inc. v. City of Longmont,* 924 P.2d 1071 (Colo.App. 1995). In such cases, municipal policies or actions may not conflict with state statutes. *Denver & Rio Grande Western R.R. v. City & County of Denver,* 673 P.2d 354 (Colo. 1983).

Section 40–5–105 provides:

The assets of any public utility, including any certificate of public convenience and necessity or rights obtained under any such certificate held, owned, or obtained by any public utility, may be sold, assigned, or leased as any other property other than in the normal course of business *but only upon authorization by the commission and upon such terms and conditions as the commission may prescribe.* (emphasis added)

Here, the contract does not involve the sale, assignment, or lease of Mountain View's certificate or of any of its rights thereunder. Rather, the City seeks a transfer of property and the *deletion* of territory from Mountain View's certificate of public convenience and necessity. The City has complete power to purchase and to operate the facilities within its boundaries without a certificate of public convenience and necessity. Mountain View still has its certificates and has not assigned or sold them.

In complying with the trial court's order, Mountain View is required only to surrender its certificate rights. Under these circumstances, the PUC has no discretion but to accept the surrender and delete the territories from the certificates. *See City of Thornton v. Public Utilities Commission, supra; see also* 12 E. McQuillin, *Municipal Corporations* § 35.18 (3d ed.1986 rev. vol.).

*People ex rel. Hubbard v. Colorado Title & Trust Co.,* 65 Colo. 472, 178 P. 6 (1918), cited by Mountain View as dispositive authority, is not to the contrary. There, in a foreclosure proceeding concerning land owned by a railroad, our supreme court held that the PUC had exclusive jurisdiction to determine whether the railroad may abandon service and trackage and that the district court was without authority to order foreclosure where such action would effectively "junk" the railroad. However, the rights of a municipality were not at issue in that case; here, they are central to the dispute.

Therefore, we hold that the trial court did not err in determining that it had jurisdiction and that, under these circumstances, the PUC's role in the deletion of the affected territories was nothing more than a ministerial function.

## II.

Mountain View next argues that the trial court erred in concluding that the application of §§ 40–9.5–201 through 40–9.5–207 would impair the obligations of this contract. We disagree.

Section 40–9.5–206(2) provides that:

Nothing in this part 2 [§§ 40–9.5–201 through 40–9.5–207] shall impair the obligations of existing contracts.

■ A promise exchanged for a promise imposes mutual obligations and is sufficient consideration to render a contract enforceable. *DeFeyter v. Riley,* 43 Colo.App. 299, 606 P.2d 453 (1979). Further, a lawful contract based on valuable consideration for the delivery of a thing in the future, upon the happening of an event which may occur, creates enforceable rights and obligations. *British America Assurance Co. v. Colorado*

& *Southern Ry. Co.*, 52 Colo. 589, 125 P. 508 (1912).

Here, under either Mountain View's or the City's interpretations of the agreement, the City possessed the right to demand the surrender of specific facilities whenever it annexed portions of Mountain View's service area. Mountain View had a corresponding obligation to surrender those facilities at the agreed upon price. Those rights and obligations arose at the time the contract was created.

■ Because the contract at issue was an existing contract with defined and enforceable rights and obligations at the time that § 40–9.5–206(2) was enacted, the trial court did not err in concluding that §§ 40–9.5–201 through 40–9.5–207 were inapplicable insofar as they would impair the parties' obligations under the contract.

### III.

Mountain View next contends that the trial court's decision frustrated a federal purpose, and that, therefore, the United States was an indispensable party which should have been joined in the litigation. We disagree.

C.R.C.P. 19(a) defines when a person is necessary for the just adjudication of a case. This rule provides that:

> [A] person who is properly subject to service of process in the action shall be joined as a party in the action if: (1) In his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may: (A) As a practical matter impair or impede his ability to protect that interest or (B) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. . . .

Under the federal Rural Electrification Act (REAct), a cooperative public utility that has borrowed funds from the Rural Utility Services (RUS)(formerly the Rural Electrification Administration (REA)) must receive permission from the RUS before it can sell or dispose of its property, rights, or franchises. This obligation extends until all principal and interest owed to the RUS has been paid. 7 U.S.C. § 907 (1994).

■ The RUS is a lending agency rather than a public utility regulatory body. *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission*, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983). Still, the RUS is the administrative agency charged by Congress with responsibility for facilitating rural electrification. The RUS was intended by Congress to determine the appropriate course of conduct to accomplish this purpose. Thus, the federal courts have properly given wide latitude to its determinations. *Public Utility District No. 1 v. Big Bend Electric Cooperative, Inc.*, 618 F.2d 601 (9th Cir.1980).

■ In the absence of RUS approval, transfers of property between a cooperative utility and a municipality are likely to frustrate the purpose behind the REAct of providing low-cost, reliable electric service to rural areas. The application of state condemnation laws to effectuate such transfers may thus be preempted. *See Morgan City v. South Louisiana Electric Cooperative Ass'n*, 31 F.3d 319 (5th Cir.1994).

The RUS possesses the authority to permit or deny the transfer of property from a cooperative electric association that has borrowed funds from the RUS. As noted above, the lack of authorization effectively preempts state or local legislation that facilitates such transfers. Moreover, the RUS can be expected to monitor, on a continuing basis, the effects on its program of state and local action.

The record does not indicate that the RUS objected or would object to the transfer under the contract here. Nor is there any indication that the RUS has decided that such contractual transfers would conflict with federal goals. In the absence of contrary evidence, we decline to impute preemptive intent to the RUS in this matter. *See Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)(declining to assume, in

the absence of promulgated regulations by the FDA, that party's conduct threatens federal goals).

This is not a case in which the RUS (or REA) has failed or refused to approve a contract providing for the transfer of a cooperative utility's property. *See Public Utility District No. 1 v. Big Bend Electric Cooperative, Inc., supra* (contract between cooperative utility and municipality for transfer of property is unenforceable when not approved by the REA). Nor is this a case in which a municipality seeks to avail itself of a state condemnation law that permits municipalities unilaterally to interfere with the federal purpose behind the REAct. *See Morgan City v. South Louisiana Electric Cooperative Ass'n, supra; Public Utility District No. 1 v. United States,* 417 F.2d 200 (9th Cir.1969).

■ This is a case in which the REA has already approved the contract at issue. And, there is no indication that the RUS now opposes an interpretation of the contract that would include territories devoid of facilities. Under these circumstances, we can find no federal objective, relating to the funds disbursed to Mountain View under the provisions of the REA, that would be thwarted by the enforcement of the contract. *See City of Stilwell v. Ozarks Rural Electric Cooperative Corp.,* 79 F.3d 1038 (10th Cir.1996). Thus, the trial court did not err in concluding that the United States was not an indispensable party.

### IV.

Mountain View next contends that if we determine, as we have, that active PUC supervision over the deletion of territories is unnecessary, then the contract is in violation of antitrust laws. We disagree.

On July 1, 1992, the Colorado Antitrust Act of 1992 (the Act) became effective. It replaced a variety of statutes dealing with the restraint of trade and commerce. The Act applies to any conduct that violates its terms, or to any cause of action which accrues, on or after July 1, 1992. Colo. Sess. Laws 1992, ch. 45, at 244.

■ We presume that, in the statutes at issue, the General Assembly equated "cause of action" with "claim for relief." *State Farm Mutual Auto Insurance Co. v. Springle,* 870 P.2d 578 (Colo.App.1993); *see also* C.R.C.P. 8(a); *Smith ex rel. Leech v. Mills,* 123 Colo. 11, 225 P.2d 483 (1950).

■ A claim for relief arising out of nonperformance of a contract arises at the time of the failure or refusal to do a thing required under the contract. *Twin Lakes Reservoir & Canal Co. v. Bond,* 156 Colo. 433, 399 P.2d 793 (1965).

Here, while the record does not reflect the exact date of the accrual of the City's cause of action, it is clear that it accrued before July 1, 1992. Accordingly, this transaction is not governed by the Act, and we must look to the statutes in effect at the time the agreement was made to determine if the contract was in restraint of trade. *See Colowyo Coal Co. v. Colorado Springs,* 879 P.2d 438 (Colo. App.1994)(law in place at time contract was entered into governs a contract with a municipality).

Colo. Sess. Laws 1957, ch. 142, § 6–4–101 at 369, of the Restraint of Trade and Commerce Act (now repealed and reenacted as §§ 6–4–101 to 6–4–122, C.R.S. (1992 Repl. Vol. 2)) provided:

> Every contract or combination in the nature of a trust or conspiracy in restraint of trade or commerce is declared illegal. Every ... contract intended to restrain or prevent competition in the supply or price of an article or commodity constituting a subject of trade or commerce in this state, or every ... contract which controls in any manner the price of any such article or commodity, fixes the price thereof, or limits or fixes the amount or quantity thereof to be manufactured, produced, or sold in this state, or monopolizes or attempts to monopolize any part of the trade or commerce in this state, is declared an illegal restraint of trade.

Colo. Sess. Laws 1957, ch. 142, § 6–4–106 at 370–71 provided:

> All contracts or agreements made by any person, firm, corporation, or association while a member of any combination, conspiracy, trust, or pool prohibited under this

article which are founded upon, or are the result of, or grow out of, or are connected with any violation of this article, either directly or indirectly, shall be void, and no recovery thereon or benefit therefrom shall be had by or for any such person, firm, corporation, or association.

█ Further, it is a fundamental principle of contract law that parties cannot by private contract abrogate the statutory requirements or conditions affecting the public policy of the state. *University of Denver v. Industrial Commission,* 138 Colo. 505, 335 P.2d 292 (Colo.1959); *Briggs v. American Family Mutual Insurance Co.,* 833 P.2d 859 (Colo.App.1992).

There are no Colorado cases interpreting the former restraint of trade statutes that would assist us in examining Mountain View's argument. However, Colorado courts have looked upon the federal antitrust decisions as persuasive authority in the construction of Colorado's restraint of trade statutes. *See People ex rel. Woodard v. Colorado Springs Board of Realtors, Inc.,* 692 P.2d 1055 (Colo.1984); *cf.* § 6–4–119 C.R.S. (1992 Repl.Vol. 2) ("It is the intent of the general assembly that, in construing [the new Colorado Antitrust Act of 1992], the courts shall use as a guide interpretations given by the federal courts to comparable federal antitrust laws.").

█ Under federal law, not all contracts which involve activities in the restraint of trade violate the federal antitrust statutes. For example, states are generally not prohibited from imposing restraints on competition. *See Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

█ Private parties and municipalities may also be immune from federal antitrust liability under certain circumstances. For example, state regulation of private parties may immunize the parties from federal antitrust laws when: (1) the private parties' conduct in restraint of trade "reflect[s] a clear articulation of the State's policy," and (2) the state engages in active supervision of the anticompetitive conduct. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum,*

*Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233, 243 (1980).

█ However, the second prong of the two-part *Midcal Aluminum* test does not apply to municipalities. Rather, to be immune from antitrust liability, a municipality need only show that the anticompetitive conduct taken reflects a clear articulation of state policy. *Hallie v. Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985).

The second prong of the *Midcal Aluminum* test, requiring active state supervision, is important mainly for evidentiary purposes. When a party succeeds in proving that there is active state supervision, that party has demonstrated that the challenged conduct was likely undertaken pursuant to state policy. However, when the party benefitting from an anticompetitive arrangement is a municipality, the only real danger is that it will attempt to advance its own municipal public interest at the expense of overarching state priorities. But, in circumstances in which a municipality is acting pursuant to a clearly articulated state policy, that danger is minimal. *Hallie v. Eau Claire, supra; see generally* P. Areeda & H. Hovenkamp, *Antitrust Law* § 212.7 (1995 Supp.); 17 E. McQuillin, *Municipal Corporations* § 49.94.25 (3d ed.1993 rev. vol.).

Thus, for the City to be immune from federal antitrust liability, it need only show that its role in the contract with Mountain View was undertaken pursuant to a clearly articulated state policy.

Regardless of the City's potential liability, Mountain View argues that it will be subjected to antitrust liability under the two-part *Midcal Aluminum* test if active PUC supervision over the deletion of territories from its certificates is determined to be unnecessary. However, this is not the case.

In *Fuchs v. Rural Electric Convenience Cooperative Inc.,* 858 F.2d 1210 (7th Cir. 1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989), the court held that a cooperative electric association was immune from federal antitrust liability if it satisfied the first prong of the two-part *Midcal Aluminum* test. The court found that a cooperative electric association had both pub-

lic and private attributes and that such associations were in some sense "instrumentalities of the United States." *Fuchs v. Rural Electric Convenience Cooperative Inc., supra,* at 1217.

Thus, the court determined that a cooperative electric association "is a hybrid entity with sufficient non-private attributes that its activities require some lower level of supervision to ensure that it is acting pursuant to state policy." It then held that:

> [W]hen an entity charged with an antitrust violation is neither a municipality nor a state agency but does not have attributes of a purely private actor, it may be held immune as a state actor without the active scrutiny of market conditions which is a necessary prerequisite for holding a private entity immune.

*Fuchs v. Rural Electric Convenience Cooperative Inc., supra,* at 1217–18. *But see* P. Areeda & H. Hovenkamp, *Antitrust Law* § 212.7a (1995 Supp.).

■ We agree with the Seventh Circuit's reasoning in *Fuchs.* A cooperative electric association is not a purely private entity. Thus, for such an entity to avoid federal antitrust liability, it need only be shown that its anticompetitive conduct was undertaken pursuant to a clearly articulated state policy.

■ Further, we are persuaded that the federal case law on the subject is applicable to determine the scope of immunity available under Colorado law. Indeed, while the Colorado Antitrust Act of 1992 is inapplicable to this litigation, it is worthy of note that § 6–4–108(4) of the new legislation expressly provides that persons, activities, or conduct immune from federal antitrust liability are likewise immune under the Colorado Antitrust Act of 1992.

■ Thus, we hold that a municipality or cooperative electric association is immune from state antitrust liability when it is shown that the anticompetitive conduct at issue was undertaken pursuant to a clearly articulated state policy. Such entities need not show that there is active state supervision over their activities.

Mountain View next argues that there is no clearly articulated state policy authorizing the transfer of service areas from Mountain View to the City, thus displacing competition in the electric utility industry. We disagree.

■ While a municipality may choose to enter into competition with a cooperative electric utility, *see Poudre Valley Rural Electric Ass'n v. Loveland, supra,* it is not required to do so. Rather, the constitution and statutes of this state permit a municipality to displace a cooperative electric association operating within municipal boundaries. *See City of Thornton v. Public Utilities Commission, supra.*

Colo. Const. art. XXV and art. V, § 35, demonstrate an intent that municipalities be able to operate public utilities within their boundaries unfettered by public utilities regulation. Also, § 40–9.5–206(1) states: "Nothing contained in this part 2 [§§ 40–9.5–201 to 40–9.5–207] shall prohibit a municipality and a cooperative electric association from buying, selling, or exchanging electric distribution facilities, service rights, and other rights, property, and assets by mutual agreement."

While § 40–9.5–206(1) was enacted after the contract was made, it, nevertheless, reflects a legislative intent to articulate and affirm a pre-existing state policy. Thus, this section is relevant in our determination whether a state policy exists to allow the anticompetitive arrangement between Mountain View and the City. *See California Aviation v. City of Santa Monica,* 806 F.2d 905 (9th Cir.1986); *see generally* P. Areeda & H. Hovenkamp, *Antitrust Law* § 212.4c (1995 Supp.).

■ When read together, these constitutional and statutory provisions demonstrate a legislative intent that municipalities be permitted to purchase the service rights and facilities of cooperative public utilities. Thus, we conclude that there is a clearly articulated state policy that authorizes the contract between Mountain View and the City. Both parties are, therefore, immune from state antitrust laws and the contract is not rendered unenforceable by such laws.

## V.

Mountain View next contends that genuine issues of material fact remain and that the trial court erred in granting the City's motion for summary judgment. We agree.

Summary judgment is proper under C.R.C.P. 56(c) in situations in which the pleadings, affidavits, depositions, or admissions establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The burden of establishing that no genuine issue of fact remains is on the moving party. *Continental Air Lines v. Keenan*, 731 P.2d 708 (Colo.1987). In assessing the sufficiency of the evidence for purposes of determining a motion for summary judgment, all inferences from factual averments must be made in favor of the non-moving party. *CenCor, Inc. v. Tolman*, 868 P.2d 396 (Colo.1994).

A trial court may not look beyond the plain words of a contract to interpret it based on the contracting parties' underlying intent unless the contract's terms are ambiguous or are used in a special or technical sense not defined in the contract. *KN Energy, Inc. v. Great Western Sugar Co.*, 698 P.2d 769 (Colo.1985).

A document is ambiguous when it is reasonably susceptible to more than one meaning. The fact that a contract is silent on a particular matter does not by itself necessarily create ambiguity as a matter of law. Silence does create ambiguity, however, when it involves a matter naturally within the scope of a contract. *Cheyenne Mountain School District # 12 v. Thompson*, 861 P.2d 711 (Colo.1993).

Whether a contract is ambiguous is a question of law, and this court need not defer to the trial court's interpretation of the contract. *Cheyenne Mountain School District # 12 v. Thompson, supra*.

When applying these doctrines of contract law in an appeal from summary judgment:

[i]t is often the case that although the basic facts are not in dispute, the [contracting] parties in good faith may nevertheless disagree about the inferences to be drawn from these facts, what the intention of the parties was as shown by the facts, or whether an estoppel or a waiver of certain rights admitted to exist should be drawn from such facts.

*S.J. Groves & Sons Co. v. Ohio Turnpike Commission*, 315 F.2d 235, 237–38 (6th Cir. 1963). Under such circumstances, the case is not one to be decided by the trial court on a motion for summary judgment. *S.J. Groves & Sons Co. v. Ohio Turnpike Commission, supra; Livingston v. Citizen's Utility, Inc.*, 107 Ariz. 62, 481 P.2d 855 (1971); 10A C. Wright, A. Miller, & M. Kane, *Federal Practice & Procedure* § 2730.1, at 276 (1983).

Here, in its final judgment, the trial court stated:

THIS COURT FINDS AND CONCLUDES that the parties have a valid agreement which is enforceable and the terms of which had been agreed to as is demonstrated by the contract itself *and by the conduct of the parties after the contract was entered, and that during the term of the Agreement, and prior to the dispute in question, the parties consistently interpreted the agreement* to cover all territories of Defendant, with or without facilities, annexed by the City. (emphasis added)

In support of this conclusion, the court cited *Tucker v. Ellbogen*, 793 P.2d 592 (Colo.App. 1989). In that case, a division of this court held, *inter alia*, that it is proper to admit evidence to explain a written contract when its terms are indefinite and uncertain.

Analysis of the trial court's findings, when read together with the authority cited, leads us to conclude that the trial court determined that the agreement was ambiguous in its reference to the transfer.

On its face, the contract is silent about the disposition of territories barren of facilities. Based on the comprehensive nature of the agreement, the disposition of territories was a matter naturally within its scope. Thus, we agree with the implicit determination by the trial court that the contract is ambiguous as to whether territories within Mountain View's service area which contained no facili-

ties were covered by its agreement with the City upon its annexation.

If the contract covered these territories, Mountain View would be required to seek exclusion of these territories from its certificate without receiving any compensation. If, on the other hand, the parties' agreement was not intended to apply upon the annexation of such territories, the compensation due to Mountain View, if any, will be determined in accordance with the statutory requirements.

 Since the contract is ambiguous, evidence concerning the intent of the parties is admissible to aid in its interpretation. Also, the record contains evidence that tends to suggest that the parties have not totally agreed on the interpretation of the contract since 1981. These apparently conflicting interpretations of the agreement's purpose and terms raise a question of material fact. Therefore, summary judgment at this early stage in the proceedings was inappropriate.

The summary judgment in favor of the City is reversed, and the cause is remanded for further proceedings consistent with the views expressed in this opinion.

CRISWELL and ROTHENBERG, JJ., concur.