Colorado Court of Appeals Opinions || March 10, 2016

Colorado Court of Appeals -- March 10, 2016
2016 COA 33. Nos. 14CA1483 & 15CA0216. Rocky Mountain Exploration, Inc. v. Davis Graham & Stubbs LLP.

 
 
 
 COLORADO COURT OF APPEALS

 
 2016 COA 33

 
 

 Court of Appeals Nos. 14CA1483 & 15CA0216
 City and County of Denver District Court Nos. 11CV5601 & 12CV5910
 Honorable Kenneth M. Laff, Judge

 Rocky Mountain Exploration, Inc., and RMEI Bakken Joint Venture Group, 

 Plaintiffs-Appellants,

 v.

 Davis Graham & Stubbs LLP and Gregory Danielson, 

 Defendants-Appellees.

  

 JUDGMENT AFFIRMED

 Division III

 Opinion by JUDGE BOORAS
 Webb and J. Jones, JJ., concur

 Announced March 10, 2016

 Dean Neuwirth, P.C., Dean Neuwirth, Denver, Colorado; Rouse Hendricks German May PC, William D. Beil, Phillip G. Greenfield, Kansas City, Missouri, for Plaintiffs-Appellants

 Lewis Roca Rothgerber Christie LLP, Frederick J. Baumann, Tamara F. Goodlette, Gregory B. Kanan, Denver, Colorado, for Defendants-Appellees

 ¶1       Plaintiffs, Rocky Mountain Exploration, Inc., and RMEI

 Bakken Joint Venture Group (collectively RMEI), appeal the district court’s order granting defendants’, Davis Graham & Stubbs LLP and Gregory Danielson (collectively DGS), motion for summary judgment. We affirm the district court’s entry of summary judgment and its award of costs.

 I. Background

 ¶2       This lawsuit arises out of DGS’s representation in connection with RMEI’s 2010 sale of its oil and gas interests to Lario Oil and Gas Company (Lario). Lario served as an agent for Tracker,[1] which was an unidentified principal in the transaction. Tracker was also DGS’s client.

 A. RMEI’s Sale to Tracker

 ¶3       In 2006, RMEI and Tracker executed a purchase and sale letter agreement (2006 purchase and sale agreement) under which RMEI agreed to sell an undivided 80% of its oil and gas interests in certain leaseholds in North Dakota. Pursuant to the terms of the 2006 purchase and sale agreement, the parties (1) created an area of mutual interest and (2) agreed that within sixty days they would enter into a joint operating agreement.

 ¶4       In 2007, RMEI and Tracker entered into a joint operating agreement as required under the 2006 purchase and sale agreement. In relevant part, the joint operating agreement expressly disclaimed any joint venture or fiduciary relationship between the parties.

 ¶5       In 2008, RMEI and Tracker executed a participation agreement "to provide for their participation in the development of the Subject Lands and the [area of mutual interest]." In relevant part, the participation agreement provided that it "and the [joint operating agreement] contain the entire agreement between the Parties concerning the subject matter referred to herein and they shall supersede and replace any prior agreements between the Parties concerning such subject matter."

 B. Tracker’s Attempt to Buy Out RMEI

 ¶6        In 2009, Tracker made several offers to buy out RMEI’s remaining 20% interest in the leaseholds. Tracker offered $10 million, but RMEI declined, apparently seeking a figure in the $15 million range. Tracker and RMEI were ultimately unable to reach an agreement.

 ¶7       In May 2010, Tracker and Lario "struck a deal" to jointly bid on RMEI’s remaining 20% interest. However, they kept Tracker’s involvement quiet because Tracker and RMEI’s relationship had become strained following Tracker’s unsuccessful bid to buy out RMEI’s remaining interest. In other words, Lario would serve as Tracker’s agent in the transaction.

 C. The RMEI/Lario Transaction

 ¶8       On August 12, 2010, RMEI executed a letter of intent to sell its remaining interest to Lario for $14.265 million. The parties formalized their agreement on August 31, 2010, by entering into an asset purchase and sale agreement (RMEI/Lario purchase and sale agreement).

 ¶9       After the parties had agreed to the transaction, a Lario officer asked the president of RMEI if he had any objections to DGS representing Lario in the deal. RMEI’s president agreed. However, DGS later determined that a conflict of interest existed that prevented it from representing Lario.

 ¶10       Nevertheless, DGS handled the negotiations for Lario and Tracker because it represented Tracker. As part of its representation, DGS drafted closing documents and hosted the closing at its offices.

 ¶11        In September, before the sale closed, Lario’s president e-mailed RMEI’s president, stating, "our attorney is preparing the partial [l]ien release for Citizen’s Bank to execute." DGS received a copy of this e-mail and later sent the lien release to RMEI’s president, but it did not correct Lario’s assertion that Lario’s "attorney" would be sending the document. In subsequent e-mails between Lario and RMEI, Lario continued to represent that DGS was its lawyer. Although DGS was copied on some of those e-mails, DGS did not inform RMEI that it represented only Tracker in the transaction.

 ¶12       The sale closed on September 29, 2010. As agreed, Lario then sold a portion of its acquired interest to Tracker. Lario and Tracker subsequently auctioned all of the interests in the North Dakota leaseholds for what the district court characterized as "a handsome profit."

 D. The RMEI Lawsuit

 ¶13       After the auction, RMEI sued Lario and Tracker, along with their officers individually, and DGS. All defendants but DGS settled. For purposes of this appeal, RMEI alleged that DGS (1) engaged in a civil conspiracy to use Lario as a strawman purchaser; (2) aided and abetted Tracker’s breach of its fiduciary duty to RMEI; (3) tortiously interfered with RMEI’s business expectancy; (4) committed fraud; (5) aided and abetted fraud; and (6) engaged in a civil conspiracy to commit fraud.

 ¶14       DGS moved for summary judgment. It contended that RMEI could not establish a duty owed by DGS to support the fraud claims. It also argued that RMEI failed to establish that Tracker owed RMEI fiduciary duties.

 ¶15       The district court granted DGS’s motion. It agreed with DGS that RMEI failed to establish (1) a duty owed by DGS to support RMEI’s fraud claims and (2) a fiduciary duty to support RMEI’s other claims. The district court also concluded that use of a strawman purchaser is not fraudulent.

 II. Standard of Review and Summary Judgment

 ¶16       We review a district court’s grant of summary judgment de novo. Armed Forces Bank, N.A. v. Hicks, 2014 COA 74, ¶20.

 ¶17       "Summary judgment is appropriate when the pleadings and supporting documents demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." Id. In reviewing a district court’s grant of a party’s motion for summary judgment, we view the facts in the light most favorable to the nonmoving party. Id.

 III. Counts III, IV, and XII

 ¶18       RMEI contends that the district court erred when it granted DGS’s motion for summary judgment on counts III, IV, and XII in RMEI’s first amended complaint. We address each count in turn.

 A. Count III — Civil Conspiracy

 ¶19       In count III, RMEI alleged that DGS and the other defendants, who are not parties to this appeal, engaged in "a scheme and conspiracy to unlawfully misappropriate RMEI’s Oil and Gas Interest in the [area of mutual interest] by setting up Lario as a straw man purchaser of such interests at a price/acre they knew was substantially below the price expected to be received in the pending auction."

 ¶20       RMEI asserts that the district court erred when it granted summary judgment on the basis that use of a strawman purchaser did not support its claim for civil conspiracy. We are not persuaded.

 1. Agents for Undisclosed or Unidentified Principals

 ¶21       Agents regularly act on behalf of undisclosed or unidentified principals. See, e.g., Water, Waste & Land, Inc. v. Lanham, 955 P.2d 997, 1002 (Colo. 1998); Filho v. Rodriguez, 36 P.3d 199, 200 (Colo. App. 2001); Restatement (Third) of Agency § 6.03 (2006) (hereinafter Restatement). There is no suggestion in Colorado case law that doing so is fraudulent. See, e.g., Water, Waste & Land, 955 P.2d at 1002; Filho, 36 P.3d at 200.

 ¶22       To the contrary, the ability of an agent to act on behalf of an unidentified or undisclosed principal has "practical importance." Restatement § 6.03 note b. For example,

 by dealing as [an] undisclosed principal, [a] person interested in assembling [a] tract of land from multiple owners for [a] large-scale project can overcome [the] problem of hold-out owners who, once [the] buyer’s interest becomes known, may exploit [the] buyer’s vulnerability by demanding prices well in excess of current market value.

 Id. (citing J. Dennis Hynes & Mark J. Lowenstein, Agency, Partnership, and the LLC: The Law of Unincorporated Business Enterprises 351-52 (6th ed. 2003)).

 ¶23       Nevertheless, a third party may avoid a contract entered into by an agent acting for an undisclosed principal if (1) the agent falsely represents that it does not act on behalf of a principal and (2) "the principal or agent had notice that the third party would not have dealt with the principal." Id. § 6.11(4).

 ¶24       In all but such narrow circumstances, however, a third party may not rescind the contract. This is so because, ordinarily, "[i]f a third party wishes certainty that the party with whom it deals will be the only party with rights and liabilities under the contract, the third party may insist that the contract so provide." Id. at cmt. d. Moreover, the third party may "insist on a provision prohibiting assignment of the contract." Id. Lastly, the third party is always free to "ask the person with whom it deals whether that person acts as agent for an undisclosed principal." Id.

 ¶25       By narrowing the circumstances under which a third party may rescind a contract, "an undisclosed principal who purchases property or goods from a third party" is protected from a third party "who regrets the transaction after learning the purchaser’s identity." Id. "Such regret on the part of a seller is often based on a belief that, had the purchaser’s identity been known, the seller would have demanded, and the buyer would have paid, a higher price." Id.

 2. Discussion

 ¶26       As the district court observed and we have set forth above, an agent’s — or strawman’s — purchase on behalf of an undisclosed or unidentified principal is a legal method of dealing with a hold-out buyer. See, e.g., Filho, 36 P.3d at 200 (an agent who enters into a contract on behalf of an undisclosed principal is liable for breach); Restatement § 6.03. In other words, Lario, Tracker, and DGS’s "scheme" to purchase RMEI’s oil and gas interests through a strawman did not amount to fraudulent conduct. Accordingly, RMEI’s civil conspiracy claim, as pleaded in count III, fails. See Walker v. Van Laningham, 148 P.3d 391, 396 (Colo. App. 2006) (a plaintiff must establish one or more unlawful acts as an element to civil conspiracy).

 ¶27       Nevertheless, RMEI asserts that the narrow exception to the undisclosed principal doctrine applies in this case. We disagree for two reasons.

 ¶28       First, the Restatement draws a distinction between undisclosed and unidentified principals. The exception applies to the former but not the latter. Restatement § 6.11(4). "A principal is undisclosed if, when an agent and a third party interact, the third party has no notice that the agent is acting for a principal." Id. § 1.04(2)(b) (emphasis added); see also Filho, 36 P.3d at 201. A principal is merely unidentified, however, if "when an agent and a third party interact, the third party has notice that the agent is acting for a principal but does not have notice of the principal’s identity." Restatement § 1.04(2)(c); see also Filho, 36 P.3d at 201.

 ¶29       In this case, both the letter of intent and the 2010 RMEI/Lario purchase and sale agreement gave RMEI notice that Lario was acting as an agent for a principal. The letter of intent stated, "Lario has other investors or partners who may elect to join in the acquisition of the Properties under the terms of this Letter Agreement. Lario shall have the right to assign a portion but not all of its interest in this Letter Agreement to such investors or partners." (Emphasis added.) The 2010 RMEI/Lario purchase and sale agreement similarly stated, "[b]uyer shall have the right to assign a portion but not all of its interest in the Agreement to third parties who have agreed to participate in the transaction." (Emphasis added.) Accordingly, Tracker was an unidentified principal, Filho, 36 P.3d at 201, and section 6.11(4)’s exception for purchases made on behalf of an "undisclosed principal" is inapplicable.

 ¶30       The Restatement’s limitation of the exception to "undisclosed principals" makes sense. If a principal is merely unidentified, a party has notice, at the time of contracting, that the agent is acting on behalf of a principal. Under such circumstances, the third party may (1) insist on a provision that provides that the agent "will be the only party with rights and liabilities under the contract"; (2) "insist on a provision prohibiting assignment of the contract"; or (3) "ask the person with whom it deals whether that person acts as agent for an undisclosed principal." Restatement § 6.11 cmt. d. If the agent declines any of those requests, the third party need only refuse to contract.

 ¶31       In this case, RMEI did not ask if Lario was acting as an agent for a principal, and it did not ask whom the "third parties" were who had "agreed to participate in [the] transaction." Nor did RMEI insist on a term providing that Lario would be the only party with rights under the contract or a provision prohibiting assignment. To the contrary, in the 2010 RMEI/Lario purchase and sale agreement, RMEI expressly acknowledged that Lario had "third parties who ha[d] agreed to participate in the transaction," and it expressly agreed that Lario could assign a portion of its interests under the contract.

 ¶32       RMEI contends that it could not have had notice that Lario was acting as an agent for Tracker because Tracker was neither an investor nor a partner of Lario. We disagree because, as we read the Restatement, the point of its distinction between undisclosed and unidentified principals is notice generally. If a seller is on notice that the buyer with whom it transacts is acting as an agent for a principal, the third party may take the precautionary measures we discussed above. Thus, the outcome is the same even if RMEI’s assertion is correct that Tracker was not, in fact, an investor or partner of Lario.

 ¶33       Second, even if we assume, for the purpose of argument, that RMEI is right that it had not received notice, and that Tracker was therefore an undisclosed principal, section 6.11(4)’s exception applies only when an agent "falsely represents to the third party that the agent does not act on behalf of a principal." (Emphasis added.) To meet that standard, the third party must ask "the person with whom it deals whether that person acts as [an] agent for an undisclosed principal." Id. at cmt. d. If the agent declines to answer, the agent has "made no representation." Id. However, if the agent answers the third party’s question falsely, the agent "has made a false representation to the third party." Id. Under such circumstances, the third party may avoid the contract "if the agent had notice that the third party would not have dealt with the principal." Id.

 ¶34       In this case, RMEI did not present any evidence that Lario falsely represented that it was not acting on behalf of Tracker. In other words, RMEI did not establish the existence of a disputed material fact as to section 6.11(4)’s applicability.

 ¶35       Alternatively, RMEI contends that the strawman purchase was fraudulent because Lario and DGS had a duty to disclose the true buyer under Mallon Oil Co. v. Bowen/Edwards Associates, Inc., 965 P.2d 105 (Colo. 1998). RMEI relies on Mallon’s general statement that "[a] defendant has a duty to disclose to a plaintiff with whom he or she deals material facts that ‘in equity or good conscience’ should be disclosed." Id. at 111 (citation omitted). We are not persuaded.

 ¶36       Mallon’s general rule is inapplicable under these circumstances. As we set forth above, a strawman’s purchase on behalf of an undisclosed principal is a legal method of dealing with a hold-out buyer. Thus, neither "equity" nor "good conscience" gave rise to a duty to disclose in this case. See id. A contrary holding would eviscerate the doctrine that an agent may transact on behalf of an undisclosed principal — a doctrine that had "practical importance" under the circumstances of this case. See Restatement § 6.03 note b.

 ¶37       Nonetheless, RMEI cites four out-of-state cases for the proposition that the Mallon duty applies to agents for undisclosed principals. In three out of four of those cases, however, the agents falsely represented that they did not act on behalf of the undisclosed principal. See Walker v. Galt, 171 F.2d 613, 614 (5th Cir. 1948); La. State Bar Ass’n v. Warner, 576 So. 2d 14, 15 (La. 1991); Barnes v. E. & W. Lumber Co., 287 P.2d 929, 942-43 (Or. 1955). And in the fourth case, the third party took the precautionary measure we discussed above by including an anti-assignment provision in its contract with the agent for the undisclosed principals. See Stude v. Madzo, 217 N.W.2d 5, 9 (N.D. 1974).

 ¶38       Thus, the cases cited by RMEI are in line with our reading of the Restatement that absent the circumstances set forth in section 6.11(4)’s exception, use of an undisclosed principal is not fraudulent. See Barnes, 287 P.2d at 942 (citing a predecessor version of section 6.11(4) for the proposition that a contract may be rescinded if the third party "was induced to enter into it by a representation that the agent was not acting for a principal") (citation omitted). But, as we discussed above, there is no genuine factual issue that section 6.11(4)’s exception applies in this case.

 B. Count IV – Aiding and Abetting a Breach of a Fiduciary Duty

 ¶39       As relevant for purposes of this appeal, count IV alleged that DGS aided and abetted Tracker’s breach of its fiduciary duty to RMEI.2 The question then is whether the 2006 transaction between RMEI and Tracker created a fiduciary relationship between those parties. The district court concluded that it did not. It reasoned that the parties’ joint operating agreement and participation agreement expressly disclaimed any joint venture or fiduciary relationship between the parties.

 ¶40       RMEI contends that the district court erred when it reached that conclusion. We disagree.

 1. Additional Background

 ¶41       The 2006 purchase and sale agreement between RMEI and Tracker stated that within sixty days of closing, they would enter into a joint operating agreement. The agreement also stated that upon its execution, the parties "shall have entered into an Area of Mutual Interest."

 ¶42       In 2007, the parties entered into the joint operating agreement as required under the 2006 purchase and sale agreement. Article VII.A of that agreement addressed the liability of the parties:

 The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract area. . . . It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm’s-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to the activities hereunder.

 (Emphasis added.) The cover page of the joint operating agreement stated, "[a]ttached to and made part of that certain [2006] Purchase and Sale Agreement . . . as stipulated in Paragraph 7."

 ¶43       In 2008, the parties executed the participation agreement. In relevant part, the participation agreement stated, "[t]his Agreement and the [joint operating agreement] contain the entire agreement between the Parties concerning the subject matter referred to herein and they shall supersede and replace any prior agreements between the Parties concerning such subject matter."

 2. Relevant Law

 a. Principles of Contract Interpretation

 ¶44       We review a district court’s interpretation of a contract de novo. Armed Forces Bank, N.A., ¶34.

 ¶45       "The primary goal of contract interpretation is to ascertain and give effect to the intent of the parties." Id. In determining the intent of the parties, we first look to the language used in the contract. Id. Ordinarily, courts do "not look beyond the four corners of the contract in determining the meaning intended by the parties." Id. at ¶35. If a provision of a contract is ambiguous, however, a court may consider extrinsic evidence to determine the parties’ intent. Gagne v. Gagne, 2014 COA 127, ¶52. A contract is ambiguous if it is "reasonably susceptible [of] more than one meaning." City of Colorado Springs v. Mountain View Elec. Ass’n, 925 P.2d 1378, 1388 (Colo. App. 1995).

 b. Joint Ventures

 ¶46       A joint venture may establish a fiduciary relationship. See Batterman v. Wells Fargo Ag Credit Corp., 802 P.2d 1112, 1117-18 (Colo. App. 1990). The elements of a joint venture are (1) a "joint interest in the property by the parties sought to be held as partners"; (2) an "agreement[], express or implied, to share in the profits and losses of the venture"; and (3) "actions and conduct showing co-operation in the project." Sleeping Indian Ranch, Inc. v. W. Ridge Grp., LLC, 119 P.3d 1062, 1069 (Colo. 2005) (emphasis omitted) (quoting Realty Dev. Co. v. Feit, 154 Colo. 44, 45, 387 P.2d 898, 899 (1963)).

 3. Discussion

 ¶47       On appeal, RMEI contends (1) the 2006 purchase and sale agreement’s creation of an area of mutual interest established a joint venture and (2) subsequent agreements between RMEI and Tracker did not end that joint venture. It asserts that this putative joint venture provided the fiduciary duty between Tracker and RMEI to support its aiding and abetting a breach of fiduciary duty claim against DGS. We are not persuaded.

 ¶48       RMEI points to a number of provisions in the 2006 purchase and sale agreement which it asserts establish the elements of a joint venture: a joint interest in property and the sharing of profits and losses. However, the unambiguous language of the joint operating agreement and the participation agreement refute RMEI’s assertion.

 ¶49       The cover page of the joint operating agreement states that it was "[a]ttached to and made part of that certain Purchase and Sale Agreement . . . between Tracker Resource Development II, LLC and [RMEI] as stipulated in Paragraph 7." It then states, "[i]t is not the intention of the parties to create, nor shall this agreement be construed as creating, a . . . joint venture . . . or to render the parties liable as partners, co-venturers, or principals." Thus, the joint operating agreement, which the parties made part of the 2006 purchase and sale agreement, expressly disavows the existence of a joint venture.

 ¶50       Even assuming that the joint operating agreement was not made part of the 2006 purchase and sale agreement, however, RMEI’s assertion of a joint venture or fiduciary relationship between it and Tracker is unavailing. The participation agreement states that it and the joint operating agreement "contain the entire agreement between the Parties concerning the subject matter referred to herein and they shall supersede and replace any prior agreements between the Parties concerning such subject matter." The subject matter referred to in the participation agreement was the area of mutual interest. So even if certain language in the 2006 purchase and sale agreement could be construed as creating a joint venture, and the joint operating agreement was not made part of that agreement, the participation agreement made clear that it and the joint operating agreement "superseded and replaced" the 2006 purchase and sale agreement with respect to the area of mutual interest. And, as we set forth above, the joint operating agreement expressly disavowed the existence of a joint venture or fiduciary relationship.

 ¶51       Accordingly, the district court did not err when it granted summary judgment on RMEI’s aiding and abetting a breach of fiduciary duty claim. Because the agreements between RMEI and Tracker expressly disclaimed the existence of a joint venture or a fiduciary relationship, RMEI’s aiding and abetting a breach of a fiduciary duty claim necessarily fails. See Cooper v. Parsky, 140 F.3d 433, 439 (2d Cir. 1998) (trial court properly granted the defendant’s motion to dismiss on the plaintiff’s breach of fiduciary duty claim because the plaintiff "may not sue upon a duty which was expressly excluded from the Agreement"); Bank of Am., N.A. v. GREC Homes IX, LLC, No. 13-21718-CIV, 2014 WL 351962, at *12 (S.D. Fla. Jan. 23, 2014) (granting the defendant’s motion to dismiss because "[a]s a matter of law, no fiduciary relationship will generally be found to exist where a contract clearly and unambiguously disclaims the possibility of a fiduciary relationship"); Mandelbaum v. Fiserv, Inc., 787 F. Supp. 2d 1226, 1241 (D. Colo. 2011) (the plaintiff’s "breach of fiduciary duty claims fail as a matter of law" because the parties’ agreement "exculpate[d] Defendants of any such duties"); Asian Vegetable Research & Dev. Ctr. v. Inst. of Int’l Educ., 944 F. Supp. 1169, 1178 (S.D.N.Y. 1996) ("[A]s a matter of law, no fiduciary relationship exists between the parties" because the contract between them "clearly and unambiguously disclaims a fiduciary relationship.").

 ¶52       RMEI’s contention that the participation agreement did not incorporate the terms of the joint operating agreement has no effect on our resolution of this claim.

 ¶53       The participation agreement stated that it and the joint operating agreement constituted "the entire agreement between the parties concerning the [area of mutual interest] and they shall supersede and replace any prior agreements between the parties concerning [the area of mutual interest]." Thus, the joint operating agreement, which expressly disclaimed a joint venture or fiduciary relationship, along with the participation agreement, replaced the 2006 purchase and sale agreement with respect to the area of mutual interest. That result stands regardless of whether the participation agreement incorporated the terms of the joint operating agreement.

 C. Count XII – Tortious Interference With Business Expectancy

 ¶54       Count XII alleged that DGS tortiously interfered with RMEI’s business expectancy "by failing to disclose the existence of a pending auction, [and] by conspiring to conceal that Lario was a straw man purchaser for the benefit of TREND [and] Tracker II . . . ." RMEI has not made any arguments related to a failure to disclose the existence of a pending auction, and we have rejected its claim that use of a strawman purchaser under the circumstances was fraudulent. We therefore affirm the district court’s grant of summary judgment on count XII.

 IV. Counts XVI, XVII, XVIII

 ¶55       RMEI contends that the district court erred when it granted DGS’s motion for summary judgment on RMEI’s fraud claims — counts XVI, XVII, and XVIII in its first amended complaint. We disagree.

 A. Additional Background

 ¶56       v RMEI’s fraud claims relate to DGS’s representation of Tracker in the 2010 transaction between RMEI and Lario.

 ¶57       Count XVI asserted a generic fraud claim. It alleged that DGS

 engaged in, and acquiesced to, repeated affirmative conduct and statements intended to mislead RMEI and its joint venture partners into believing DGS and Danielson were at all times acting solely as legal counsel to Lario in the [2010] RMEI/Lario transaction, and to conceal the truth that DGS and Danielson were in fact representing only Tracker’s interests in the [2010] RMEI/Lario transaction.

 (Emphasis added.) RMEI further alleged that the misrepresentations were material because "[h]ad the true identity of DGS’s and Danielson’s clients been known to the RMEI group, the RMEI Bakken Joint Venture Group would not have sold to Lario." 

 ¶ 58       In count XVII, RMEI alleged that DGS participated in a civil conspiracy to commit the fraud set forth in count XVI above. In count XVIII, RMEI asserted that DGS aided and abetted that same fraud.

 B. Discussion

 ¶ 59       RMEI contends that the district court misconstrued its "affirmative fraud" claim in count XVI as a fraudulent nondisclosure claim. It asserts that its claim was not based on DGS concealing that Tracker was its client but was, instead, "based on DGS’ affirmatively misrepresenting that Lario was its client." Thus, the district court erred when it granted DGS’s summary judgment motion based on DGS having no duty "to disclose true facts." Citing to cases standing for the general proposition that an attorney may not engage in fraud, RMEI contends that count XVI exists "independent of a duty to disclose true facts." We are not persuaded.

 ¶60       On appeal, RMEI contends that DGS misrepresented that Lario was its client. But in its first amended complaint, RMEI alleged that DGS "misled RMEI and its joint venture partners into believing DGS and Danielson were at all times acting solely as legal counsel to Lario in the RMEI/Lario transaction, and [acted] to conceal the truth that DGS and Danielson were in fact representing only Tracker’s interests in the RMEI/Lario transaction." (Emphasis added.) Thus, the fraud claim in the first amended complaint asserted that DGS misled RMEI by (1) failing to disclose that it also or only represented Tracker and (2) concealing the fact that it represented only Tracker’s interests.

 ¶61       Moreover, RMEI’s response to DGS’s motion for summary judgment tracks the district court’s construction. Therein, RMEI asserted, in reference to count XVI, that "the existence of a fiduciary duty is not an element of fraudulent nondisclosure claims under Colorado law." It then contended that DGS had a duty to disclose pursuant to Mallon, 965 P.2d at 111.

 ¶62       Accordingly, the district court did not err in construing RMEI’s affirmative fraud claims as nondisclosure claims. See Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc., 406 F.3d 1052, 1064 (8th Cir. 2005) ("A variation of fraudulent misrepresentation is fraudulent omission. Silence may amount to a representation, constituting the first element of fraudulent misrepresentation, if the party sought to be held accountable for fraud (1) conceals material facts and (2) has a legal duty to disclose such facts.").

 ¶63       On appeal, RMEI does not contend that DGS had a duty to disclose that it represented only Tracker — the undisclosed principal. We therefore affirm the district court’s grant of summary judgment as to the affirmative fraud claim. See Wainscott v. Centura Health Corp., 2014 COA 105, ¶79 ("To succeed on a claim for fraudulent concealment or nondisclosure, a plaintiff must show that the defendant had a duty to disclose material information." (quoting Mallon, 965 P.2d at 111)). And, because count XVI fails, counts XVII (civil conspiracy to commit fraud) and XVIII (aiding and abetting fraud) fail as well. See Walker, 148 P.3d at 396 (As an element of a civil conspiracy, a plaintiff must prove "one or more unlawful overt acts.") (citation omitted); see also Restatement (Second) of Torts § 876 (1979) (a party is liable for aiding and abetting the tortious conduct of another if he (1) "does a tortious act in concert with the other or pursuant to a common design with him"; or (2) "knows that the other’s conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself"; or (3) "gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person").

 ¶64       Lastly, we note that the record supports affirmance on the alternative ground that RMEI could not have, in fact, relied on DGS’s alleged fraud. Initially, we reiterate the fraud alleged in RMEI’s first amended complaint: DGS committed fraud by leading RMEI to believe that "DGS and Danielson were at all times acting solely as legal counsel to Lario in the RMEI/Lario transaction, and to conceal the truth that DGS and Danielson were in fact representing only Tracker’s interests in the RMEI/Lario transaction." (Emphasis added.) Under the circumstances, as a matter of law, RMEI could not have relied on DGS’s alleged fraud.

 ¶65       DGS’s alleged fraudulent conduct occurred after RMEI had signed the letter of intent to sell its oil and gas interests, and after it executed a purchase and sale agreement of those interests. See Moses.com, 406 F.3d at 1065 (regarding a claim for negligent misrepresentation, the plaintiff "could not have relied on the press release in initially deciding to hire [defendant] because the press release was issued months after [defendant] and [plaintiff] had signed the letter of intent"); Sundown, Inc. v. Pearson Real Estate Co., 8 P.3d 324, 331 (Wyo. 2000) ("Reliance is reasonable when false representations have occurred prior to the execution of the contract which is sought to be avoided or for which damages are sought to be recovered.").

 V. Other Issues

 ¶66       RMEI concedes that we need not address the district court’s application of the economic loss rule if we otherwise affirm the district court’s grant of summary judgment.

 ¶67       RMEI also asserts that if we reverse the grant of summary judgment, we must also reverse the district court’s award of costs to DGS as the prevailing party. Because we affirm the district court’s judgment, we also affirm its award of costs to DGS as the prevailing party.

 VI. Conclusion

 ¶68 The district court’s summary judgment and its award of costs are affirmed.

 JUDGE WEBB and JUDGE J. JONES concur.

 [1] Tracker refers collectively to Tracker Resource Exploration ND, LLC and its affiliated entities and officers.

 [2] RMEI appears to assert that the district court erred in granting summary judgment on count IV on the basis that RMEI failed to establish a fiduciary duty. It contends that no fiduciary duty was required because Mallon Oil Co. v. Bowen/Edwards Associates, Inc., 965 P.2d 105 (Colo. 1998), establishes a duty to support its fraudulent concealment claim in count I. However, count IV specifically alleges that DGS aided and abetted a breach of a fiduciary duty. Thus, count IV necessarily requires a showing of a fiduciary duty running from Tracker to RMEI. In any event, as we concluded above, in the absence of a fraudulent representation that the agent does not represent the undisclosed principal, Mallon does not establish a duty to disclose.

These opinions are not final. They may be modified, changed or withdrawn in accordance with Rules 40 and 49 of the Colorado Appellate Rules. Changes to or modifications of these opinions resulting from any action taken by the Court of Appeals or the Supreme Court are not incorporated here. 

Colorado Court of Appeals Opinions || March 10, 2016

Back