RENDERED: APRIL 22, 2022; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0151-MR

WILLIAM MILES ARVIN, JR.; AND
KENTUCKY PROPERTY
MANAGEMENT, LLC[1]                                                                APPELLANTS


                    APPEAL FROM JESSAMINE CIRCUIT COURT
v.                  HONORABLE C. HUNTER DAUGHERTY, JUDGE
                    ACTION NO. 17-CI-00111


DAREN CARTER AND SOUTHERN
TAX SERVICES, LLC                                                                  APPELLEES


                                OPINION
                                AFFIRMING

                          ** ** ** ** **

BEFORE: ACREE, DIXON, AND K. THOMPSON, JUDGES.

DIXON, JUDGE: William Miles Arvin, Jr., and Kentucky Property Management,

LLC, (KPM) appeal from the order and judgment entered on January 4, 2021, by

---

[1] Unbridled Holdings, LLC, was dismissed as an Appellant to this appeal by an order of our
Court entered on October 26, 2021.

the Jessamine Circuit Court.  Following review of the record, briefs, and law, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

This case was previously on appeal in *Unbridled Holdings, LLC v. Carter*, 607 S.W.3d 188 (Ky. App. 2020) (hereinafter "*KPM 1*").  We adopt the following statement of facts herein:

> In 2007, Arvin and Carter entered into an agreement to form a Kentucky limited liability company to invest in the purchase and redemption of delinquent tax lien certificates.  The two men named their company Southern Tax Services, LLC ("Southern Tax").  Articles of organization for Southern Tax were filed with the Kentucky Secretary of State on or about December 13, 2007.  Southern Tax actively purchased tax lien delinquency certificates for several years after its formation; however, it ceased doing so well before this litigation began.  At that time, its business activity was focused almost solely on collections as related to its existing lien portfolio.

> Later, Arvin and Carter formed two additional Kentucky limited liability companies:  [KPM], in 2008 and Unbridled Holdings, LLC ("Unbridled"), in 2012.  The purpose of both companies was to take title to, hold, and manage the real property acquired by Southern Tax in conjunction with its tax lien redemption business.  [KPM's] primary purpose was to purchase and lease properties long-term, while Unbridled was formed to acquire riskier properties to lease short-term and then sell.  While the original intent may have been for both companies to purchase most of their properties from Southern Tax and its related litigation, as it turned out, [KPM] acquired very little property from Southern Tax.  In contrast, Unbridled purchased all of its properties from

-2-

Southern Tax and/or its related foreclosure litigation.  It is unclear what Unbridled's long-term business plans were in light of Southern Tax's decision to stop acquiring new certificates of delinquency.

Arvin and Carter entered into an identical operating agreement for each company.  Arvin, an attorney licensed to practice law in Kentucky, largely oversaw the drafting of the articles of organization and operating agreements.  The operating agreements provided that each company was organized as a Kentucky limited liability company pursuant to [Kentucky Revised Statutes (KRS)] 275.001 through KRS 275.455.  The stated purpose of the companies and the general nature of their businesses "shall include all transactions of any or all lawful business for which limited liability companies may be formed under the laws of the State of Kentucky."  Operating Agreements Sec. 1.9.  Management of the companies was vested in their two members, Arvin and Carter, who were each given separate authority to oversee "the ordinary and day-to-day decisions concerning the business affairs" of the companies.  Operating Agreements Sec. 2.1.

Section 2.2 of the operating agreements, entitled "Binding Authority of Members," is particularly relevant to this appeal.  It provides:

> The parties hereto hereby agree that the members of the Company shall have the authority to bind the Company.  No person other than a member shall take any action as a member to bind the Company, and shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such member.  Nothing in this agreement shall prevent or preclude any member from delegating or granting any or all of their authority to manage the company to another member or members.  Each member has the power to do all things necessary or

convenient to carry out the business and affairs of the Company, including but not limited to the following actions:

(i) the entering into contracts and guaranties; incurring of liabilities; borrowing money, issuance of notes, bonds, and other obligations; and the securing of any of its obligations by mortgage or pledge of any of its property or income;

(ii) the purchase, receipt, lease or other acquisition, ownership, holding, improvement, use and other dealing with property wherever located;

(iii) the sale, conveyance, mortgage, pledge, lease, exchange, and other disposition of property;

(iv) the lending of money, investment and reinvestment of Company funds, and receipt and holding of property as security for repayment, including the loaning of money to Company members, employees, and agents;

(v) the appointment of employees and agents of the Company and the establishment of their compensation;

(vi) the payment of compensation, or additional compensation to any or all members, and employees on account of services previously rendered to the Company, whether or not an agreement to pay such compensation was made before such services were rendered;

(vii) the participation in partnership agreements, joint ventures, or other associations of any kind with any person(s) or entities;

(viii) the indemnification of member or any other person.

Operating Agreements Sec. 2.2.

Section 3.3, entitled "Member's Management Rights," contains a list of certain actions that require the "unanimous written consent" of the members. The actions include: (1) the sale, mortgage, or encumbrance of all or substantially all of the assets; (2) disposal of goodwill; (3) submission of a company claim to arbitration; (4) confession of a judgment; (5) commission of an act that would make it impossible for the company to carry on its ordinary course of business; (6) amendment of the operating agreement; (7) amendment of the articles of organization; and (8) continuation of the company after an event causing dissolution. Operating Agreements Sec. 3.3. Section 5.1 additionally provides that "no member shall have any right to sell, transfer, or assign an interest in the Company without the written consent and approval of all of the members." Operating Agreements Sec. 5.1.

Section 6.1 governs events causing dissolution. It lists various scenarios whereby the companies may be dissolved. The two events relevant to this litigation are contained in subsections (b) and (c). Subsection (b) allows dissolution pursuant to "any order of a court of competent jurisdiction requiring dissolution." Operating Agreements Sec. 6.1. Subsection (c) permits dissolution by "the unanimous written consent of all members entitled to vote to dissolve the Company." *Id.*

For several years, Arvin and Carter managed the companies peacefully and with little discord. Arvin performed most of the day-to-day management with the assistance of two full-time employees; Carter generally allowed Arvin to do so without objection or interference. In June of 2015, things changed dramatically. Arvin and Carter became embroiled in a bitter personal dispute unrelated to the companies. While the dispute itself did not involve the companies, the acrimony soon worked its way into the members' management of the companies.

Before long, there was a breakdown of all communication between the two men such that they refused to speak to one another on any subject, including management of the companies. Since June of 2015, all of their communications with one another have been in writing. A series of electronic messages between Arvin and Carter dating from July 28, 2015, through February 23, 2017, was admitted into the record below by Arvin to show the total breakdown of their business relationship.

Initially, the disputes between the two related primarily to Southern Tax. Carter complained about Arvin charging Southern Tax for legal work he performed and demanded that the company pay him a share of the legal fees as he claims Arvin had initially promised to do. Arvin eventually hired an outside law firm to perform all the legal work for Southern Tax. Carter made other demands regarding Southern Tax; he requested that the physical office space of Southern Tax and Unbridled be moved, that Southern Tax's investment strategies be changed, and insisted he must be informed on all operational matters and approve any decisions in writing. Arvin contends that he did as much as he could to appease Carter and salvage their business relationship even though doing so caused operational chaos and financial loss.

As Carter attempted to become more involved in the management of the companies, the parties' business relationship continued to decline. The parties could not come to any agreement regarding the businesses. The problems were compounded because the operating agreements vested both Arvin and Carter with "the power to do all things necessary or convenient to carry out the business and affairs of the Company" and did not provide a mechanism for resolving disputes related to those affairs. Despite this provision, in an email dated August 12, 2015, Carter instructed Mike Wade, one the companies' employees, that he did not want the companies to do *anything* unless both he and Arvin

authorized it in writing. His email to Mr. Wade states: "Going forward I am only comfortable if we both sign anything that is related to any of our companies that we have a joint interest in. This also includes any checks written by the companies."

When a commercial property owned by [KPM], a mini mall, needed roof maintenance, Arvin and Carter could not agree on whether to replace or patch the roof. According to Arvin, the parties' inability to make a decision caused the roof to go unrepaired for many months risking the loss of the mall's tenants. Additionally, the parties began to contradict one another's day-to-day business decisions. On one occasion, Carter fired the sole employee of Southern Tax and Unbridled. The employee stayed on at Arvin's request, but Carter refused to acknowledge the individual was an employee and refused to approve any work done by him. Additionally, at one point, Carter suggested that he would not agree to anything Arvin proposed for any of the three companies until Arvin agreed to move Southern Tax's office space.

Arvin testified that Carter's demands and objections to the companies' operations had nothing to do with his desire to benefit the companies or act in their best interests; rather, Arvin believes that Carter was simply trying to punish Arvin and make his life more difficult. In fact, Arvin testified that Carter went so far as to make statements that he did not care how much money he lost so long as Arvin lost the same amount.

Things reached a boiling point when Carter accused Arvin of embezzling money from the companies. At this point, Arvin concluded that he could not stay in a business relationship with someone who would accuse him of criminal conduct. Shortly thereafter, Arvin sent an electronic message to Carter asking him to consent to the dissolution of the companies. Carter refused to consent to dissolve Southern Tax; however, he expressed

a willingness to sell Unbridled's real property holdings and to buy-out Arvin's interests in [KPM's] real property. It appears that nothing came of this offer because Arvin wanted out of all three companies.

In the midst of this escalating dissension, Arvin received an unsolicited offer to purchase Southern Tax's entire tax lien portfolio for $210,000.00. According to Arvin, the specific terms of the offer were such that the net value of the offer to Arvin and Carter was approximately $400,000.00. Arvin believed the offer was "incredibly generous and remarkable from a business perspective." Because the operating agreement required the unanimous written consent of the members for the sale of substantially all the company's assets, Arvin could not unilaterally accept the offer; to move forward, Arvin had to obtain Carter's written consent, which Carter refused to give on the basis that the value of the company's lien portfolio was much greater than $210,000.00. This led Arvin to offer Carter the right to buy out his interest in Southern Tax's lien portfolio for one-half of the third party's total offer amount. If Carter thought the portfolio was worth much more than $210,000.00, Arvin could see no reason for Carter to pass up such a bargain. However, Carter refused Arvin's offer.

Ultimately, Arvin concluded that he and Carter would never be able to effectively manage their companies. Arvin wanted out, and with Carter unwilling to voluntarily agree to dissolve the three companies, the only remedy he believed available to him was forced judicial dissolution. On February 20, 2017, after nearly two years of acrimony, Arvin filed a petition in Jessamine Circuit Court seeking to have the three companies ordered dissolved pursuant to KRS 275.290. Carter objected to court-ordered dissolution.

The trial court conducted a two-day evidentiary hearing. After Arvin rested his case, Carter moved for a

dismissal pursuant to [Kentucky Rules of Civil Procedure (CR)] 41.02(2). The trial court denied the motion with respect to Southern Tax; however, it sustained the motion with respect to Unbridled and [KPM]. The trial court entered a final judgment on June 13, 2018. Therein, it explained that it dismissed Arvin's petition to dissolve Unbridled and [KPM] because Arvin "failed to introduce evidence sufficient to establish a *prima facie* case that it was not reasonably practicable to carry on the businesses [of these two companies] in conformity with the operating agreements for each." In support of its conclusion, the trial court made the following findings of fact: (1) the operating agreement of each company permits either member acting alone to do all things necessary or convenient to carry on the day-to-day business and affairs of the company; (2) the business of [KPM] is the rental of real estate long-term with no plan to sell; (3) the business of Unbridled is the rental of real estate until sale; and (4) there is no deadlock with regard to the management of the day-to-day operations of either [KPM] or Unbridled and both businesses are still functioning.

In contrast, the trial court's final judgment ordered Southern Tax to be dissolved. It found that Southern Tax had not purchased any tax liens since 2012 and had been in the process of winding down its business for the last several years, and that Carter and Arvin could not agree on selling Southern Tax's remaining assets. The trial court concluded that the parties' inability to agree on whether to sell Southern Tax's remaining assets authorized it to "wind down the affairs of [Southern Tax] and judicially dissolve it" pursuant to KRS 275.290.

Thereafter, Arvin filed this appeal challenging the trial court's dismissal of his petition as related to the dissolution of [KPM] and Unbridled.

*Id*. at 190-95 (footnotes omitted).

In *KPM 1*, we vacated the trial court's judgment "insomuch as it dismissed the petition for dissolution of [KPM], and Unbridled Holdings, LLC, and remand[ed] for additional proceedings[.]" *Id*. at 199. On remand, the trial court reviewed the existing record considering the guidance from the appellate opinion. It then issued an order and judgment reaffirming its prior judgment dismissing the demand to dissolve KPM and Unbridled. This appeal followed.

## STANDARD OF REVIEW

"On appellate review of a ruling on a defendant's CR 41.02 motion, we will overturn the trial court only for an abuse of discretion. An abuse of discretion will be found when the trial court's decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id*. at 196 (internal quotation marks and citations omitted).

## ANALYSIS

On appeal, Arvin contends the trial court abused its discretion by dismissing his petition to dissolve KPM as a Kentucky limited liability company ("LLC"). Judicial dissolution of an LLC is authorized by KRS 275.290, which provides, in pertinent part:

> (1) The Circuit Court for the county in which the principal office of the limited liability company is located, or, if none, in the county of the registered office, may dissolve a limited liability company in a proceeding by a member **if it is established that it is not reasonably practicable to carry on the business of the limited**

-10-

**liability company in conformity with the operating agreement**.

(2) If after a hearing the court determines that one (1) or more grounds for judicial dissolution exist, it may enter a decree of dissolution[.]

(Emphasis added.)

Unfortunately, prior to *KPM 1*, there was no published case law interpreting the meaning of "not reasonably practicable" as used in this context in Kentucky. *KPM 1*, 607 S.W.3d at 197. Consequently, that panel looked to other states and found that while "there is no universally accepted standard or definition of 'not reasonably practicable'. . . almost all the outside authorities permit judicial dissolution under the 'not reasonably practicable' standard in situations short of deadlock." *Id.* It further held "the 'not reasonably practicable' standard requires the trial court to conduct a multifaceted analysis which takes into account a number of different factors that go well beyond whether there is a technical deadlock." *Id.*

*KPM 1* referred to the factors found in *Gagne v. Gagne*, 338 P.3d 1152 (Colo. App. 2014), as an example of what our courts should consider in determining whether a party has met the "not reasonably practicable" standard for dissolution of an LLC. These include:

(1) whether the management of the entity is unable or unwilling reasonably to permit or promote the purposes for which the company was formed; (2) whether a member or manager has engaged in misconduct; (3) whether the members have clearly reached an inability to

work with one another to pursue the company's goals; (4) whether there is deadlock between the members; (5) whether the operating agreement provides a means of navigating around any such deadlock; (6) whether, due to the company's financial position, there is still a business to operate; and (7) whether continuing the company is financially feasible.

*Id*. at 1160.  *KPM 1* noted this "list is not exhaustive and no one factor is determinative."  *KPM 1*, 607 S.W.3d at 198.

The prior panel further instructed that the "not reasonably practicable" standard "does not require that the purpose of the company, as set out in the operating agreement, be completely frustrated or totally *impossible* to fulfill before the trial court can order judicial dissolution."  *Id*.  Instead, it "allows for dissolution where the disagreement or conflict among the members regarding the means, methods, or finances of the company's operations is so fundamental and intractable as to make it unfeasible for the company to carry on its business as originally intended."  *Id*.

On remand, the trial court was directed to consider all the *Gagne* factors, not just whether the parties were deadlocked.  Per the appellate instructions, the trial court issued a 19-page order and judgment discussing the *Gagne* factors and the relevant facts in the record pertaining to each in its decision to affirm its previous judgment.  Even so, Arvin takes issue with the trial court's analysis of the following factors:  (1) whether the management of the entity is

-12-

unable or unwilling reasonably to permit or promote the purposes for which the company was formed; (2) whether a member or manager has engaged in misconduct; (3) whether the members have clearly reached an inability to work with one another to pursue the company's goals; and (4) whether there is deadlock between the members.[2] We will discuss each, in turn.

First, Arvin argues the management of KPM is unable or unwilling reasonably to permit or promote the purposes for which the company was formed. The language of KPM's operating agreement is broad. Its stated purpose and the general nature of its business "shall include all transactions of any or all lawful business for which limited liability companies may be formed under the laws of the State of Kentucky." Operating Agreement Sec. 1.9. *See also KPM 1*, 607 S.W.3d at 191. Yet, the trial court, as noted in *KPM 1*, found its "primary purpose was to purchase and lease properties long-term[.]" *Id*. Arvin's contention that this was not the purpose of KPM is not borne out by the record. Regardless, Arvin failed to demonstrate that his conflict with Carter did not reasonably permit the business of KPM to be carried out.

---

[2] Arvin failed to challenge the trial court's findings on the following elements: (5) whether the operating agreement provides a means of navigating around any such deadlock; (6) whether, due to the company's financial position, there is still a business to operate; and (7) whether continuing the company is financially feasible. Failure to raise an issue on appeal is tantamount to waiver. "An appellant's failure to discuss particular errors in his brief is the same as if no brief at all had been filed on those issues." *Milby v. Mears*, 580 S.W.2d 724, 727 (Ky. App. 1979) (citation omitted).

-13-

Second, although Arvin agrees with the trial court's finding that he did not commit any misconduct, he takes issue with the trial court's finding that Carter did not engage in misconduct. However, Arvin fails to raise any issues of alleged misconduct regarding KPM, but instead relies on allegations concerning Carter's conduct regarding Southern Tax insisting that the effects of the conduct dealing with Southern Tax bled over to KPM. More than mere insinuations are needed however, for Arvin to make a *prima facie* argument that Carter engaged in misconduct regarding KPM. Arvin's failure to do so is fatal to his argument on this point. Thus, the trial court did not err in finding Arvin failed to present sufficient evidence to survive dismissal on this point.

Third, Arvin claims KPM's members have clearly reached an inability to work with one another to pursue the company's goals. Yet, he has provided no proof that KPM's goals are not being met. The trial court correctly found that the company's long-term leasing style, coupled with the fact that daily operations are managed by a third party, has kept the parties' disdain for one another from frustrating the realization of KPM's goals. While the situation between Arvin and Carter is clearly not optimal, we cannot say the trial court abused its discretion in refusing to dissolve KPM because of their personal issues. Their contempt for one another has not yet had an impact so significant on KPM's business as to render its operation "not reasonably practicable."

-14-

Fourth, and finally, Arvin contends there is a deadlock between the members of KPM. *KPM 1* acknowledged that there was at least some deadlock, but also stated "[t]his type of deadlock of course will be present in almost every judicial dissolution case that results in a hearing." *Id*. at 198 n.7. Aside from their disagreement on whether to continue the operation of KPM, the only other specific instance Arvin presented at trial to prove deadlock concerned a roof in need of repair. Carter agreed to have a temporary fix applied for no greater than $10,000 while Arvin insisted on a more permanent and expensive repair. Arvin refused to approve spending $10,000 to repair the roof, and at the time of the final hearing, it was still unrepaired. Nevertheless, considering the record as a whole, we cannot say the trial court abused its discretion by determining Arvin failed to present adequate proof of deadlock or any of the other *Gagne* factors to satisfy the "not reasonably practicable" standard. Consequently, we cannot say the trial court erred by dismissing Arvin's petition to dissolve KPM.

## CONCLUSION

Therefore, and for the foregoing reasons, the order of the Jessamine Circuit Court is AFFIRMED.


ACREE, JUDGE, CONCURS.

THOMPSON, K., JUDGE, CONCURS IN RESULT ONLY.

BRIEFS FOR APPELLANTS:

David Russell Marshall
Keene, Kentucky

BRIEF FOR APPELLEES:

Anthony J. Gonzalez
Lexington, Kentucky